**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA,**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NORTHERN VIRGINIA CITIZENS ASSOCIATION, INC.<br>P.O. Box 302<br>McLean, VA 22101<br><br>                              *Plaintiff,*<br><br>        v.<br><br>FEDERAL HIGHWAY ADMINISTRATION,<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590,<br><br>VIRGINIA DEPARTMENT OF TRANSPORTATION,<br>1401 E. Broad St.<br>Richmond, Virginia 23219,<br><br>W. SHEPPARD MILLER III, in his official capacity as Secretary of the Virginia Department of Transportation,<br>1401 E. Broad St.<br>Richmond, Virginia 23219<br><br>TRANSURBAN, LLC<br>6440 General Green Way<br>Alexandria, VA 22312<br><br>CAPITAL BELTWAY EXPRESS, LLC<br>6440 General Green Way<br>Alexandria, VA 22312<br>                              *Defendants.* | Civil Action No.   _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Northern Virginia Citizens Association, Inc. ("NOVA Citizens Association" or "NOVA"), by and through its undersigned counsel, in support of its Complaint for Declaratory and Injunctive Relief states as follows:

## INTRODUCTION

1. Defendants Federal Highway Administration ("FHWA") and the Virginia Department of Transportation State Highway Administration ("VDOT"), through their contractors, including Defendants Transurban LLC ("Transurban") and Capital Beltway Express LLC ("CBE"), have begun construction of the I-495 Express Lanes Northern Extension Project (the "I-495 NEXT Project" or the "Project") in Fairfax County, Virginia. The I-495 NEXT Project will extend the I-495 express lanes along approximately two miles of the Capital Beltway from their current northern terminus in the vicinity of the Old Dominion Drive overpass to the George Washington Memorial Parkway in the McLean area of Fairfax County.

2. In conjunction with the I-495 NEXT Project in Virginia, the Maryland Department of Transportation State Highway Administration ("MDOT") had plans to widen and add toll lanes to a 15-mile stretch of I-495 and I-270 in Maryland, from Gaithersburg, Maryland, across the American Legion Bridge, and connecting to the I-495 NEXT Project in McLean, Virginia (the "Maryland Project").  However, according to recent media reports, Maryland's newly elected governor and his administration have publicly stated that the Maryland Project may never be built.[1] In fact, Defendant Transurban, the company selected to

---

[1] *See,* https://www.washingtonpost.com/transportation/2023/02/11/virginia-maryland-beltway-express-lanes/; https://www.washingtonpost.com/dc-md-va/2023/03/09/i-270-beltway-project-stalled/

build and operate both the I-495 NEXT Project and the Maryland Project, announced on March 9, 2023 that it is abandoning the Maryland Project, casting into serious doubt the future of that project and its physical connection to the I-495 NEXT Project.[2]

3.      Notwithstanding these developments, Defendants are determined to create the proverbial bridge to nowhere. Defendants FHWA and VDOT, through their contractors, Defendants Transurban and CBE, have begun construction of structures in Virginia for ramps and flyovers for the I-495 NEXT Project that (1) were not part of the originally approved plan and (2) may never be used but which immediately and adversely affect NOVA and its members. The structures are designed to connect the Project to toll lanes that the political leadership of Maryland has indicated it may never approve. Defendants' insistence on pressing forward with their unauthorized construction has and will cause severe damage to the health, safety, and property of NOVA's members, as well as to the local environment.

4.      Defendants have knowingly evaded required environmental review for new, large-scale changes to the Project as required by the National Environmental Policy Act, 42 U.S.C. § 4321 ("NEPA"). On June 29, 2021, before beginning construction of the I-495 NEXT Project, Defendant FHWA issued a Finding of No Significant Impact ("FONSI") for the Project concluding that that it would not have a significant impact on the environment in the area of proposed construction. Almost a year after FHWA's decision, which was based on a review of a Revised Environmental Assessment prepared by Defendant VDOT, Defendants publicly disclosed for first time in June 2022 that they had made radical changes to the I-495 NEXT

---

[2] *See,*
https://yourir.info/resources/a50955429d255a58/announcements/tcl.asx/3A614644/TCL_Maryland_Express_Lanes_Project_update.pdf.

Project. The changes, if implemented, would result in significantly greater environmental impacts than Defendants had revealed during the draft or final EAs.

5.      Defendants revealed in their recent disclosures that the Virginia portion of the Maryland Project includes the planned construction by MDOT of additional highway lanes and flyover ramps in Virginia that they planned to connect to the I-495 NEXT Project at the terminus of the American Legion Bridge. These new and material modifications to the Project substantially increase the environmental impacts on the surrounding area and properties owned by NOVA members and other residents who live near the Project.

6.      Defendants' plan to connect the I-495 NEXT Project in Virginia to the Maryland Project also is the subject of opposition from citizens organizations in Maryland and legal challenges in two separate cases that further decreases the likelihood that the Maryland Project will ever be connected to the I-495 NEXT on the Virginia side of the American Legion Bridge: *The Northern Virginia Citizens Association v. FHWA et al.*(Case No. 8:22-cv-03336, D. Md.) and *Maryland Chapter of the Sierra Club et al. v. FHWA* (Case No, 8:22-cv-02597, D. Md*.).*

7.      Defendants violated NEPA by failing to conduct any environmental study of the impacts caused by the changes they made to the Project after the conclusion of the review and approval of the Project by FHWA on June 29, 2021, by neither preparing a supplemental environmental assessment nor an environmental impact statement. Defendants also failed to provide NOVA, and other parties most directly impacted by the Project, with notice that they had substantially changed the scope of the I-495 NEXT Project and the Maryland Project.

8.      Notwithstanding NOVA's repeated requests to VDOT to address and mitigate the harm the revised project scope is having, Defendants instead have moved aggressively to

3

construct the revised I-495 NEXT Project, including clear-cutting trees in areas that were not identified in the approved plan for the Project.

9.      As a result of Defendants' actions, NOVA and its members are experiencing significant adverse environmental impacts caused by the Project. For example, Defendants and their agents, contractors, and subcontractors have stripped away all of the trees along a large stretch of I-495, exposing previously shielded neighborhoods to extensive sound, light and air pollution. Defendants and their authorized agents also have scraped the ground bare of all vegetation, dramatically increasing erosion, as well as loadings of total suspended solids into properties owned by NOVA and its members on their way to the Potomac River, a water body that is already environmentally impaired from excess sediment loadings.

10.     Equally significant, Defendants' unauthorized addition to the I-495 NEXT Project of multiple new lanes and flyover ramps – none of which was considered in the EA process – will increase concentrations of fine particulate matter which can potentially harm the heart and lung health of NOVA's members and the residents of other communities located near the I-495 NEXT Project. Defendants FHWA and VDOT failed to conduct *any* analysis of this harmful air pollution, even though almost 1,900 Virginia students attend schools within a half-mile of the locus of the Project's scope change – and 7,500 students attend school within two miles of the Project.[3]

11.     In addition to failing to adequately evaluate the impacts of their revised scope of

---

[3] *Cooper Middle School* (1054 students; 770 feet from interchange); *Churchill Road Elementary School* (608 students; 1/2 mile from interchange); *St. Luke's Catholic School* (219 students; less than ½ mile from interchange); *Langley High School* (2107 students; 1.5 miles from interchange); *The Langley School* (481 students; 1.5 miles from interchange); *Franklin Sherman Elementary School* (337 students; 1.6 miles from interchange); *McLean Country Day School* (265 students; 1.8 miles from interchange); *McLean High School* (2429 students; 2.0 miles from interchange).

the Project, Defendants also failed to adequately consider measures that would have mitigated some of the water quality, air quality, noise, and visual impacts of the new flyover ramps and their effect on the human environment for persons living in the area.

12.     To prevent Defendants from expanding the I-495 NEXT Project and rendering it a *fait accompli* even if the Court were to order them to revise their NEPA analyses to comply with those laws, NOVA requests that this Court vacate the EA, require Defendants to prepare a Supplemental Environmental Impact Statement ("EIS"), and enjoin them from taking any further actions to finance, construct, or operate the Project until they fully comply with NEPA and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

13.     This case arises under NEPA, 42 U.S.C. §§ 4231 et seq.; and the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus against U.S. agency officers), 28 U.S.C. §§ 2201-2202 (declaratory judgment and further necessary or proper relief), and 5 U.S.C. §§ 701-706 (APA).

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the I-495 NEXT Project is being built on land and over waters within the Eastern District of Virginia and a substantial part of the property that is the subject of the action is situated in this district.

15.     It is appropriate for the Alexandria Division of this Court to decide this matter because NOVA is a non-governmental entity residing in this division and the Defendants are a federal agency and federal and Virginia officials. L.R. 501.4(a)(ii).

## PARTIES

### I.     Plaintiff Northern Virginia Citizens Association ("NOVA")

16.     Plaintiff NOVA is a nonprofit membership corporation formed under the laws of Virginia in December 2020, to educate citizens about truth and transparency in Virginia

government, and for other charitable and educational purposes. Its mission is to promote the interests and further the common good and general welfare of the citizens of Northern Virginia and to perform all things incidental to, or appropriate in, the foregoing specific and primary purpose. NOVA has more than 150 members in Northern Virginia, including 75 members who reside on Live Oak Drive, Green Oak Drive, and Rivercrest Drive (collectively the "Live Oak Drive community") in the vicinity of the planned flyover ramps that would connect the I-495 NEXT project to the Maryland Project on the Virginia side of the American Legion Bridge.

17.    NOVA submitted and signed on to letters to VDOT and the FHWA expressing concerns about the Project during the public comment period on the EA. NOVA also submitted additional materials to VDOT, MDOT and the FHWA expressing its concern about the impacts of the Project on area safety, water quality, air quality and wildlife resources after new information was disclosed by Defendants and/or discovered by NOVA after conclusion of the NEPA process in Virginia.

18.    NOVA's members live in close proximity to the flyover ramps that Defendants propose to add to the Project. Defendants' revised Project scope both moves I-495 traffic significantly closer to Live Oak Drive and narrows the width of Live Oak Drive in the vicinity of the Langley Swim Club, creating potential safety hazards for pedestrians, especially children, in a neighborhood that has no sidewalks. If Defendants are allowed to build the Project according to their previously undisclosed changes in scope, automobile traffic will substantially increase in the vicinity of the homes of NOVA's members and the Live Oak Drive residents due to the additional lanes and flyover ramps that were not analyzed in the EA that FHWA reviewed when issuing its Finding of No Significant Impact. The additional lanes and ramps also will increase the area of impervious surfaces, and therefore the amount of sediment-laden runoff

flowing through the neighborhood and contaminating the Potomac River. Defendants' revised Project scope replaces planned stormwater piping systems with a large retention basin created by stripping the trees and vegetation from the existing cloverleaf interchange between the George Washington Memorial Parkway and I-495, further exacerbating sediment contamination and erosion and creating a risk of mosquito-borne diseases.

19.     The changes to the Project scope have harmed, and continue to harm, the health of NOVA's members, as well as their recreational, aesthetic, and other interests. NOVA and its members have reasonable concerns about their health and other interests because of Defendants' failure to conduct further environmental studies of material changes planned and performed after they obtained approval of the Project. NOVA and its members continue to harmed by the I-495 NEXT Project and by the expanded scope of the Project that the federal and state regulating authorities have not reviewed for additional environmental and health impacts, as set forth in the accompanying declarations.[4] The direct impacts of MDOT's and VDOT's joint projects will be born most directly by the Live Oak Drive community, by the approximately 7,500 schoolchildren who attend schools in close proximity to the Project, by the Langley Swim Club, and by other adjacent residential communities. They also will adversely affect sensitive environmental resources in the area. NOVA and its members will experience noise and light pollution associated with the flyover ramps which, when constructed, will be located as high as 70 feet above their properties, as well as increased exposure to harmful air pollutants.

20.     The new ramps and flyovers planned by Defendants will also increase surface water run-off into the Scotts Run community and Live Oak Drive community and exacerbate

---

[4] *See Attachment 1* (Declaration of Marisha Patel); *Attachment 2* (Declaration of Siva Venuri); *Attachment 3* (Declaration of Stephen A. Jasak); *Attachment 4* (Declaration of Humair Qureshi); *Attachment 5* (Declaration of Rahul Ravi; and *Attachment 6* (Declaration of Debra Butler).

storm water management issues. The impacts from the expanded scope of the Project, which will add lanes and has drastically changed the planned stormwater management process, have not been analyzed.  In the event that the Maryland Project is never completed, the traffic flow and resultant air pollution in the area near the homes of NOVA's members will materially change from the plan that was reviewed by FHWA in the EA that was prepared by VDOT.  If the Project proceeds as planned by Defendants, traffic congestion in the area will increase in different, more populated areas and residential areas. Defendants have an obligation to evaluate those impacts but have failed to do so.

21.    NOVA members, Pritesh and Marisha Patel, live at 7001 Green Oak Drive with their children, ages 11 and 14, and their 13-year-old nephew. They moved to the Live Oak community for its quiet rural-suburban atmosphere, the proximity to Scott's Run Nature Preserve and its location within the walking distance to Cooper Middle School and Langley Swim Club. These attributes are particularly important to the Patels because their son is severely disabled: he is wheelchair bound, brain damaged with pervasive development delays, has life-threatening asthma and requires specialized care in all aspects of life. The Patels recently undertook an extensive customization of their home to serve their son's medical needs. Since VDOT cut down the trees and demolished the sound wall, however, the Patel's master bedroom, living room, their son's bedroom, and their teenage daughter's bedroom and bathroom became visible to everyone driving on the I-495 and George Washington Parkway exit, severely impacting their privacy and ability to access the outdoors. Dirt, dust, air pollution, and particulates cover their windows and cars.  Now, because of their son's life-threatening asthma, they can no longer take him outdoors.  Indeed, because of VDOT's actions, they need to revamp the home's HVAC system and install a new medical-grade filtration system.

Moreover, the Patels are regularly awakened by construction activities at 2:00 and 3:00 am. They have taken daily sound measurements; readings often reach 100 decibels, and consistently exceed 78-80 decibels. Impact rollers shake the entire house, putting its new foundation at risk. Their daughter and nephew are traumatized by the destruction, the noise and the lack of privacy, impacting their mental health and performance at school. See *Attachment 1*, Declaration of Marisha Patel.

22.     NOVA member, Sivakumar Venuri, lives at 714 Live Oak Drive with his wife and two teenage daughters. The Venuris moved to the Live Oak Drive community for its peaceful surroundings, and its proximity to parkland and the Potomac River. The Venuris' younger daughter walks to Cooper Middle School. Because of the absence of sidewalks in the neighborhood, she needs to be cautious walking to and from school, paying close attention to traffic. Her risk will increase significantly with the planned narrowing of Live Oak Drive and removal of the existing shoulder where the children currently walk. Placing a retention wall/sound barrier immediately adjacent to an extremely narrow road will leave his daughter – and the other middle school students in the neighborhood – at significant risk. Moreover, all members of the Venuri family have allergies to dust which have been greatly exacerbated by VDOT's activities – and will become worse with the increased traffic congestion in the area. The Venuris have been informed by VDOT that a significant chunk of their property will be expropriated – and used for the relocated cell tower. Mr. Venuri has concerns about the unevaluated health impacts of locating a cell tower on residential property – particularly the impacts on high daughters. He has read reports about harmful radiation from cell towers and its potential contributions to cancer risks, as reported by the American Academy of Pediatrics, among others.  See *Attachment 2*, Declaration of Siva Venuri.

23.     NOVA members, Humair and Gomar Qureshi, live at 704 Live Oak Drive with their 13- and 14-year-old children. The Qureshi's moved to the Live Oak Drive community due to its proximity to Scott's Run Nature Preserve, where they enjoy hiking. Before Defendants commenced their construction in late November 2022, the Qureshi's could view a range of birds and butterflies, as well as magnificent bald eagles, from their home. When VDOT cut down the trees and demolished the wall, the Qureshi's master bedroom and living room became visible to everyone driving on the I-495 and George Washington Parkway exit, severely impacting their privacy and rendering them vulnerable to crime. The construction dust has exacerbated the allergic symptoms from which all members of the family suffer. Gomar Qureshi has been unable to sleep from the light and noise, directly impacting her work, as well as exacerbating her struggles with depression and chronic sinusitis. Because of her depression, Gomar needs a minimum of eight hours of sleep per night – a level of sleep that has been impossible with construction continuing all night long, and with no trees to buffer the sound. Humair Qureshi is a heart patient; it is well-known that traffic-related air pollution causes adverse respiratory, cardiovascular and immune system health effects in children and adults. Both of the Qureshi children suffer similarly. Their daughter is a high school freshman at Langley (1.4 miles from the intersection); their son is at Cooper Middle School (770 feet from the intersection). The children both suffer from allergies and the son has chronic sinusitis; neither child is able to get sufficient sleep because of the construction and light pollution, impacting their mental health and performance at school. Moreover, the increased air pollution – both at their home and their schools – raises further concerns about their increased risk of asthma, other respiratory ailments and cardiovascular impacts. The additional lanes and changes to traffic patterns in the new expanded project must be studied for their impacts on vulnerable individuals like Humair and

10

Gomar Qureshi and their children.  See *Attachment 4*, Declaration of Humair Qureshi.

24.   NOVA members, Rahul and Emily Ravi, live at 710 Live Oak Drive. Their property directly overlooks the on and off-ramps connecting the Beltway to the George Washington Parkway. Prior to VDOT's implementation of their newly expanded I-495 NEXT Project, the Ravi's view of the corridor was protected by numerous trees that blocked the sounds and light of the interchange from their home. Since late November of 2022, however, they have seen the natural barriers removed, which has exposed their home directly to the adverse effects of constant traffic and construction noise. There have been numerous occasions at night – and *never* with prior notice – where construction has carried on past midnight, causing loss of sleep, adverse health effects and negative impacts on their work. Emily works full-time from home and is forced to deal with the constant noise of construction during the day, making her workday more difficult and less productive. The Ravis have considered spending nights at a hotel because of the noise and light – but since VDOT never provides advance warning of their late-night activities, even planning to stay in a hotel is impossible.  See *Attachment 5*, Declaration of Rahul Ravi.

25.   NOVA member, Debra Butler, is the President of the Northern Virginia Citizens Association and lives with her husband, Paul Butler, at 7012 Green Oak Drive. In mid-2018, Ms. Butler met with representatives of VDOT and Transurban, as well as McLean's elected representatives, and together walked Live Oak Drive. During that meeting, the VDOT and Transurban representatives assured Ms. Butler and the Live Oak Drive community residents and their representatives that the I-495 NEXT project would not destroy the old growth trees that surround the neighborhood. When Ms. Butler raised similar concerns in 2021 with John Simkins of the FHWA, he told her that FHWA was just a "rubber stamp" for whatever VDOT

and Transurban chose to send them. Now, with the destruction of all of the trees on Live Oak

Drive, the Butlers have seen significantly increased stormwater runoff in their backyard,

resulting in dramatic erosion that has exposed over 50 feet of electrical wires that serve the

neighborhood. With the building of the retaining wall and sound barriers, that erosion will

increase.  See *Attachment 6*, Declaration of Debra Butler.

**II.    Defendants Federal Highway Administration, et al.**

26.    Defendant Federal Highway Administration is a federal agency and a subdivision

or "administration" of the federal Department of Transportation. FHWA co-published the EA

for the I-495 NEXT Project. FHWA is responsible for and has a continuing duty to supplement

an EA when significant changes to the project are made that may affect is environmental

impact.

27.    Defendant Virginia Department of Transportation is the state agency charged with

planning, designing, building, and maintaining Virginia's highway system. VDOT owns and

maintains the I-495 Beltway in Virginia. VDOT co-published the EA with FHWA and served as

co-lead agency for its development. VDOT is constructing the I-495 NEXT Project in

accordance with a radically changed design and scope that was not considered or discussed in

any documentation up to and including the final EA.

28.    Defendant W. Sheppard Miller III is VDOT's Secretary and responsible for its

operations. Mr. Miller is sued in his official capacity.

29.    Defendant Transurban is a Delaware corporation. Transurban is the North

American subsidiary of Transurban Group, an Australian corporation. VDOT contracted with

Transurban to construct the I-495-NEXT Project. Transurban is funding approximately 28

percent of its costs for building the I-495 NEXT Project (approximately $212,000,000) through

a loan from the federal government pursuant to the Transportation Infrastructure Finance and Innovation Act of 1998 ("TIFIA"), 23 U.S.C. §§ 601-609 and 49 C.F.R. §80.

30.     Defendant Capital Beltway Express LLC is a subsidiary of Defendant Transurban and on information and belief is one of the contractors performing construction work on the I-495 NEXT Project.

## STATUTORY AND REGULATORY BACKGROUND

31.     Congress enacted the National Environmental Policy Act ("NEPA") to "promote efforts which will prevent or eliminate damage to the environment," and by extension human health and welfare. 42 U.S.C. § 4321. NEPA makes it "the continuing policy of the Federal Government, in cooperation with States," "to create and maintain conditions under which man and nature can exist in productive harmony." *Id*. § 4331(a). It directs the federal government "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs and resources" to "preserve important historic, cultural, and natural aspects of our natural heritage"; "assure for all Americans safe, healthful, productive and esthetically and culturally pleasing surroundings"; and to "fulfill the responsibilities of each generation as trustee of the environment" for future ones. *Id*. § 4331(b)(1), (2), (4).

32.     To further these purposes, NEPA requires federal agencies to prepare a "detailed statement" on environmental effects before pursuing "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement ensures that agencies "take a 'hard look' at the environmental effects" of those actions before approving them. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

33.     If an agency believes that its action is not likely to have a significant environmental impact, it may prepare an EA evaluating the environmental impacts of the

proposed action as well as all alternatives to the proposed action that were considered by the agency. 40 C.F.R. § 1501.5(c). If the agency makes a "Finding of No Significant Impact" or "FONSI," then it may forego preparation of a full EIS. 40 C.F.R. § 1501.6(a).

34.     NEPA established a Council on Environmental Quality ("CEQ") within the Executive Office of the President and empowered the CEQ to issue regulations implementing NEPA. 42 U.S.C. §§ 4321, 4342. FHWA has supplemented these regulations with its own implementing regulations, codified at 23 Code of Federal Regulations, Part 771. 23 C.F.R. § 771.109(a)(1).

35.     The CEQ's and FHWA's regulations provide for an EIS on a proposed federal action to be followed by a public record of decision ("ROD"). 40 C.F.R. § 1505.2; 23 C.F.R. § 771.127(a). Until a lawful FONSI, or EIS and ROD, has been issued, "no action concerning the proposal shall be taken which would" either "(1) [h]ave an adverse environmental impact," or "(2) [l]imit the choice of reasonable alternatives" to the proposal. *Id*. § 1506.1(a). In the context of highway projects, with limited exceptions, this means that final design activities, property acquisition, construction materials purchases, and construction "must not proceed" until a lawful FONSI, or EIS and ROD, has issued. 23 U.S.C. § 711.113(a).

36.     Issuance of a FONSI or ROD does not terminate an agency's requirement for environmental review, however. Rather, an agency *must* prepare a supplemental environmental impact statement where "The agency makes substantial changes to the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(d)(1). FHWA's governing statute and implementing regulations reiterate this requirement. *See* 23 U.S.C. § 139(l)(2) (the "Secretary [of Transportation] shall consider new information …if the information satisfies the requirements for a supplemental environmental impact statement under [23 C.F.R. §771.130].

14

The preparation of a supplemental environmental impact statement shall be considered a separate final agency action" with its own separate deadline for judicial review); 23 C.F.R. § 771.130(c) ("where the Administration is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of the changes, new information or new circumstances").[5]

37.     This requirement is necessary, for example, to prevent agencies from proposing a project with limited environmental impacts, then changing the project after completion of the EA or EIS to one with more severe environmental impacts. Thus, courts have interpreted this requirement to mandate that, "If the final action departs substantially from the alternatives described in the draft EIS, however, a supplemental draft EIS is required." *Russell County Sportsmen v. U.S. Forest Serv.,* 668 F.3d 1037, 1045 (9th Cir. 2011). Conversely, "supplementation is not required when two alternatives are satisfied: (1) the new alternative is a minor variation of one of the alternatives discussed in the draft EIS, and (2) the new alternative is qualitatively within the spectrum of alternatives that were discussed in the draft EIS." *California ex re. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of Interior,* 751 F.3d 1113, 1126 (9th Cir. 2014) (emphasis in the original) (internal quotation marks and citations omitted).

38.     As the D.C. Circuit has confirmed, "The agency's obligations under NEPA do not cease once the EIS has been prepared, however: both federal case law and regulations recognize

---

[5] FHWA's regulations similarly provide that for programs in the Federal-Aid highway program, States *must* provide for "Early and *continuing* opportunities during project development for the public to be involved in the identification of social, economic and environmental impacts." 23 C.F.R. § 771.111(h)(2)(ii) (emphasis added).

a continuing duty to supplement EISs which have already become final whenever the discovery of significant new information renders the original EIS inadequate." *Deukmejian v. NRC,* 751 F.2d 1287 (D.C. Cir. 1984).

39.     State highway agencies may co-lead the preparation of an EA or EIS for proposed highway projects within their jurisdictions, alongside FHWA. 42 U.S.C. § 4332(D)(i); 40 C.F.R. §§ 1501.5(b), 1506.2(c); 23 C.F.R. §§ 771.109(c)(2)-(5). State highway agency co-leads and project sponsors are responsible for implementing mitigation measures specified as commitments in the NEPA approval documents, under FHWA's supervision, unless the FHWA agrees to delete or change those measures. 23 C.F.R. § 771.109(b), (d).

## FACTUAL BACKGROUND

### The Design of the I-495 NEXT Project

40.     The construction, operation and maintenance of public roads, highways and bridges have traditionally been the responsibility of federal, state and local governments. In the Commonwealth of Virginia, the primary responsibility for such matters is with VDOT and its Secretary of Transportation, who reports to the Governor. For public roads and highways under federal jurisdiction, primary responsibility is with the FHWA.

41.     In or about 2006, VDOT entered an agreement to privatize the construction and operation of paid toll lanes along the I-95 corridor, otherwise known as High Occupancy Toll ("HOT") Lanes. This Public Private Partnership ("P3") project was memorialized in a 2007 contract that has been amended and restated in both 2017 and 2021, known as the Amended and Restructured Comprehensive Agreement (or "ARCA"). Defendant Transurban is a private party signatory to that contract.

42.     Under the ARCA, Transurban essentially agreed to partially finance and build the I-495 HOT Lanes from the Springfield Interchange to the Dulles Toll Road at Old Dominion

16

Drive in McLean, Virginia. In consideration of that agreement, VDOT granted Transurban a 99-year lease to operate the HOT Lanes and collect toll monies.

43.     On information and belief, under the ARCA neither VDOT nor any other part of the Virginia government has the right to audit the make-up of any lump sum amount or unit price or rate under the ARCA.

44.     On information and belief, including several news articles and Transurban financial documents, passenger usage of the previously constructed HOT Lanes from Springfield to Old Dominion has been substantially lower than forecasted and under terms of the ARCA and related agreements, the Commonwealth of Virginia has a debt to Transurban and its partners of over $200 million for shortfalls in guaranteed toll monies.

45.     Under the ARCA, Transurban is responsible for "all necessary actions," including conducting additional environmental studies (and any risk of delay) if the "design differs from the schematics upon which the NEPA documents were based." Amended and Restated Comprehensive Agreement, Section 8.04, p. 54 (2017). Despite repeated requests to Transurban, Plaintiff NOVA has been unable to locate a publicly available copy of the 2021 ARCA.

46.     In 1995, the Commonwealth of Virginia passed the Public Private Transportation Act ("PPTA"), as amended, Va. Code Ann. Sections 33.2-1800, et seq.[6]

47.     To provide financial guardrails for Virginia, the PPTA was amended in 2013 to include a requirement that all P3 transportation projects be screened for financial viability and compared with state-funded alternatives. Va. Code Ann. § 33.2-1803.1. The PPTA established

---

[6] The Secretary of Transportation has also enacted Implementation Guidelines for the PPTA, the most recent version found in the "PPTA Implementation 2017 Manual and Guidelines" ("PPTA Guidelines")

the Office of Transportation Public Private Partnerships ("OTP3 office") to administer the screening process before the projects are sent to the Commonwealth Transportation Board for approval. Under the PPTA and its regulations, the OTP3 is required to prepare a Finding of Public Interest ("FOPI") that scrutinizes whether the P3 method is being conducted in a matter that brings value and is in the best interest of the public.

48.     In 2015, a precursor design of the current I-495 NEXT Project was submitted for screening to the OTP3 office. The office made a finding of no public benefit. The then-Director of the OTP3 office concluded: "At this time, the VAP3 does not believe a P3 delivery model is suitable for the Project and does not recommend advancing this Project into Project Development…" It further stated: "In light of the ongoing dialogue with Maryland regarding the River Crossing Solutions, it is premature to make a decision on the I-495 HOT Lanes Extension. If the discussions lead to a HOT Solution, the question whether the Project should be evaluated utilizing the public-private partnership delivery model can be revisited."

49.     As stated above, at the time VDOT and the FHWA submitted the I-495 NEXT Project for an EA under NEPA, the ARCA only granted Transurban a right of way for construction of the HOT Lanes to Old Dominion Drive in McLean.  Accordingly, VDOT submitted the I-495 NEXT Project for NEPA review as a "stand alone" project and not a continuation of the prior HOT Lanes construction from the Springfield Interchange to Old Dominion. The EA was therefore approved based on those representations.

50.     In or about 2021, Plaintiff NOVA and others argued to VDOT and Transurban that any standalone project required another screening by the OTP3 office under the PPTA. In response to these complaints, and without the transparency called for by the PPTA and its Guidelines, VDOT and Transurban amended the ARCA in 2021 to extend the right of way past

Old Dominion and to the American Legion Bridge. This change was made to convert HOV lanes into HOT lanes as a means for VDOT and Transurban to present the I-495 NEXT Project as an extension to the prior Springfield project, thereby circumventing OTP3 review that previously found no public benefit for the Project, particularly with no coordinated plan with Maryland.

51.     In May 2021, VDOT issued a Revised EA studying the environmental impacts of and alternatives to the I-495 NEXT project.  The EA looked at only two alternatives: the "No Build Alternative" and the "Build Alternative." The No Build Alternative included no extension of the I-495 Express Lanes.  The Build Alternative would extend the express lanes by approximately 1.6 miles.  Only one build option was presented.

52.     On June 29, 2021, the FHWA Virginia Division approved a Finding of No Significant Impact for the I-495 NEXT project, concluding that no EIS for the project was required by NEPA. Neither the Revised EA nor the Finding of No Significant Impact for the I-495 NEXT project addressed the new ramps and flyover bridges that would be needed to connect to the American Legion Bridge after the Maryland Project is built.  Instead, the FONSI specifically stated that "the HOT [Lanes] proposal for the American Legion Bridge and connections at each end were outside of the limits of the project." I-495 NEXT FONSI at 17-18.

53.     Neither the Revised EA, FONSI, nor any technical reports associated with the I-495 NEXT Project included detailed renderings of the proposed "interchange" between the I-Project and the George Washington Memorial Parkway.

54.     The Maryland Project was advanced in the NEPA process through the preparation of a Draft EIS in June 2020 and a Supplemental Draft EIS in October 2021. These draft NEPA documents described the Maryland Toll Lanes Project as including an interchange with the

George Washington Memorial Parkway, including "slip ramps" south of American Legion Bridge, but did not disclose or evaluate any environmental impacts to the Live Oak Drive community or the McLean generally.

**Major Design Changes After Completion of the EA**

    **A.  Changes in Stormwater Management**

    55.    The EA's stormwater management plan included nineteen (19) relatively small stormwater basins scattered through the project to promote infiltration and reduce the water quality impacts of the project's increases in impervious surfaces. *See* Transurban, *Plan and Profile of Proposed State Highway,* pp. 83, 90, 95, 113, 136, 143, 164, 170, 173 (February 2022) (*available at* https://495next.org/documents/pim032020/design_plans.pdf). Small stormwater ponds like these are highly beneficial for the environment. Typically, they are vegetated throughout, as a means to naturally treat stormwater through infiltration. The vegetation also allows for the spraying of pesticides if needed to control mosquitoes, without harming water quality.

    56.    At some point after issuance of the EA, VDOT and Transurban radically changed the stormwater management plan, eliminating 16 ponds and, on information and belief, replacing them with no stormwater management whatsoever, as depicted in the following images:

# Design Updates
## Stormwater Management

  

- Condensed stormwater management (SWM) facilities from 19 to 3
- Dulles Corridor Interchange SWM pond will be a conversion of an existing facility to provide additional coverage and compensate for increased project impervious area
- George Washington Memorial (GWM) Parkway Interchange SWM pond will collect a large portion of onsite drainage from Georgetown Pike to GWM Parkway Interchange

*Source:* VDOT, "Project Update Meetings Construction and Design Information" p. 10 (June 6, 2022) (*available at* https://495next.org/public_meetings/june_67_2022_project_update_meetings.asp)

57.    One of the original small basins was located at the interchange of the Gorge Washington Memorial Parkway and the I-495 Beltway. This small pond allowed for retention of about 90 percent of the fully treed cloverleaf interchange, which in addition to allowing for greater stormwater infiltration, also provided a visual, sound and air pollution barrier for the community.

58.    The revised VDOT and Transurban stormwater management plan increased the size of this pond by more than an order of magnitude – from approximately 22,000 square feet to over 271,000 square feet. The massive new pit, which is the size of a football field and capable of holding about 16,000,000 gallons of water (*see* image below), will not allow for the type of stormwater infiltration provided by a small pond or an area full of mature trees and underbrush. Instead, this contaminated and essentially untreated water will drain through an almost 60" diameter pipe to an outfall that is barely 0.2 miles from the Potomac River.



*Source:* Transurban, *Plan and Profile of Proposed State Highway,* pp. 136, 143 (February 2022)

### B. Changes in Number and Height of Flyover Ramps

59.    The 2021 *Environmental Assessment* and supporting technical drawings included one additional ramp near Live Oak Drive, to connect the George Washington Memorial Parkway to the I-495 South Express Lanes, as shown below. The new ramp would be a spur off the existing outbound ramp, which connects to the Beltway's general-purpose lanes, and would require only that a few trees be removed in the triangle between that outbound ramp and the cloverleaf.



*Source:* Transurban, *Plan and Profile of Proposed State Highway,* p. 136 (2020) (*available at* https://495next.org/documents/pim032020/design_plans.pdf).

60.    At public information sessions held by VDOT on June 6 and 7, 2022, VDOT unveiled a radically changed design for the interchange at the George Washington Memorial Parkway. In the new plan, two more ramps have been added to the cloverleaf.  One connects the I-495 North Express Lanes with the Parkway. To accommodate these additional ramps, the outermost ramp in *Figure 1* (the ramp closest to Live Oak Drive) will be moved 10 to 20 feet closer to Live Oak Drive, such that the I-495 Beltway directly abuts the street.



*Source*: VDOT, "495 NEXT: McLean Citizens Association Transportation Committee Briefing," p. 12 (February 13, 2023) (*available at* 2023-02-

23

13_mca_transp_committee_meeting_presentation_final_2023-02-13.pdf
(495northernextension.org).

61.     At that meeting, VDOT additionally disclosed for the first time that Maryland

would be conducting extensive construction in Virginia. Maryland's construction footprint in

Virginia is partially depicted below in orange, purple and yellow (with VDOT construction in

grey).



*Source:* VDOT, "Response to Questions from Supervisor Foust, Senator Favola and Delegate
Murphy dated June 8, 2022," p. 21 (July 29, 2022)

62.     The following drawing depicts the responsibilities of VDOT and MDOT from the

American Legion Bridge to the revised interchange, with the ramps to be constructed by VDOT

as part of the I-495 NEXT Project depicted in green, and the ramps that will be built by MDOT

as part of the Toll Lanes project depicted in red:



### C.  Changes in Location and Width of Live Oak Drive

63.     The EA considered that Live Oak Drive would remain in its current form and location – a position that was affirmed at a September 29, 2021 public meeting. *See* VDOT, *Summary of Questions and Answers,*" p. 2 (September 29, 2021) (*available at* 2021-09-29_495_next_pim_meeting_notes.pdf (495northernextension.org)).

64.     At some later point, however, Defendants' plans changed. The new VDOT and Transurban plan moves Live Oak Drive closer to the homes of NOVA's members, moves the

Beltway closer to Live Oak Drive, and narrows the road to about 22 feet in width, the narrowest allowable width for a two-lane road. Defendants' new plan includes building retaining walls and sound barriers directly abutting much of Live Oak Drive, as well as moving the bridge over the I-495 Beltway that connects Live Oak Drive to Balls Hill Road. VDOT and Transurban have stated that this change is necessary to accommodate the new flyover ramps.

### D.  Change in Sound Wall Height and Location

65.    The EA depicted low sound barriers along Live Oak Drive which, combined with greenscaping, would allow the Live Oak Drive community to retain its existing character, as shown in the images below.



Figure 3-8. Existing view facing north along Live Oak Drive          Figure 3-8. Existing view facing north along Live Oak Drive



Figure 3-9. Visualization of Build Alternative facing north along Live Oak Drive          Figure 3-9. Visualization of Build Alternative facing north along Live Oak Drive

VDOT, *I-495 Express Lanes Northern Extension Revised Environmental Assessment,* pp. 3-19 – 3-20 (May 2021) (*available at* 495 Express Lanes Northern Extension :: About the Project (495next.org)*)*.

66.    The new design's flyover ramps will be higher and more numerous than contemplated by the EA.  Indeed, VDOT issued a schematic that shows ramps as much as 69

26

feet higher than Live Oak Drive. *See* VDOT, "Response to Questions from Supervisor Foust, Senator Favola and Delegate Murphy dated June 8, 2022," p. 4 (July 29, 2022). And, as noted above, the new design for retaining walls and sound barriers has them directly abutting the road, allowing no room for the type of greenscaping depicted in the EA.

### E. Movement of Existing Cell Tower

67. A cell tower is currently located in the triangle of land next to the George Washington Memorial Parkway cloverleaf interchange. Under the EA, the cell tower was to remain in that location. The creation of the massive stormwater basin, however, necessitates moving the cell tower. VDOT notified the impacted NOVA community members of its intention to move the tower approximately one-half mile – onto residential property that directly abuts the Langley Swim Club and Scotts Run Nature Preserve. Defendants provided no rationale for the change in location. A VDOT eminent domain representative previously informed the residents of 720 Live Oak Drive, in writing, that "there is not proposed to be a 5G tower placed on your property, nor in the immediate section of Live Oak Drive where you reside." Despite that, on February 27, 2023, VDOT informed the Venuri family– who live next door to 720 Live Oak Drive – that a 5G cell tower is planned to be placed on their property.  See Attachment 2, Declaration of Siva Venuri.

### F. Extensive Deforestation

68. In the EA, VDOT/Transurban committed that its "Construction practices would *avoid the removal of existing vegetation to the greatest extent possible*." VDOT, *I-495 Express Lanes Northern Extension Revised Environmental Assessment,* p. 3-85 (May 2021) (emphasis added). *See also id.* at p. 3-44 (VDOT commits to "to minimize impacts to mature and healthy trees"); pp. 3-80 – 3-81 (VDOT commits that "impacts to all potential wildlife habitat would be

avoided and minimized to the maximum extent practicable"); p. 4-7 (Virginia Department of Forestry "recommends minimizing loss of mature trees and increase in impervious surfaces").

69.     In addition, in 2018, VDOT and Transurban representatives specifically committed to the Live Oak Drive community and its elected representatives that the Project "would not destroy the trees or viewscape on Live Oak Drive" such that "trees would not be impacted" and a "sound wall would not be necessary."

70.     The combination of the new flyover ramps, the giant stormwater basin and the moving of Live Oak Drive have resulted in the land being completely denuded. Had the original stormwater retention pond been retained, approximately 90% of the mature trees and underbrush in the six-acre cloverleaf could have been retained. But for the new ramps and moving the road, the mature trees that lined Live Oak Drive could have been saved.

71.     Although VDOT and Transurban claim that they will replant (young, immature) trees when the Project has been completed, Defendants' new design replaces less than approximately 3% of the trees that have been lost.



Satellite Photographs of Live Oak Drive before and after commencement of pit construction



Live Oak Drive, looking towards the formerly wooded cloverleaf (Taken by Stephen Jasak, February 8, 2023)

**Harm to NOVA and its Members from Changes without Environmental Review**

72.    NOVA does not challenge the Project as originally proposed and studied under

29

NEPA. However, the extensive changes after environmental review described in paragraphs 50 to 66 above have caused and will continue to cause a number of significant on-going environmental harms and reasonable concerns to members of the association that could be remedied by preparation of an Environmental Impact Statement, including opportunities for public review and comment and consideration of less damaging alternatives.

73.     The major changes to the stormwater control plan, the expansion of impermeable surfaces, and the greatly expanded deforestation will result in a significant increase in the release of stormwater which is contaminated with pollutants onto the properties of members of the association, including but not limited to the property owned by the Butlers at 7012 Green Oak Drive which will exacerbate and worsen existing erosion control issues.

74.     Stormwater volumes and downstream effects were extensively considered in the original Environmental Assessment for the original proposal, but on information and belief, the effect of the changes to stormwater management have not been studied. No such studies have been made available for public review and comment. On or about February 16, 2023 counsel for NOVA requested that representatives of Transurban and VDOT make any such studies of the environmental effect of the changes available, but to date they have not been received.

75.     Changes to the stormwater management plan to mitigate the effects on nearby properties are likely if the defendants are ordered to prepare an Environmental Impact Statement including public participation and consideration of alternative designs.

76.     The changes to design and location of Live Oak Drive above will narrow and exacerbate safety issues including for school children who are visiting a local swim club and the middle school-aged children in the neighborhood who walk to Cooper Middle School. Members of the plaintiff association, including the Patels at 7001 Green Oak Drive and the

Venuris at 714 Live Oak Drive are justifiably concerned that these child safety and traffic issues resulting from the changes have not been considered in an environmental assessment.

77.     The Venuris also have justifiable concerns about VDOT's new plan to relocate a cell tower onto their residential property.  They are concerned about the potential health impacts of the cell tower's radiation on their two teenaged daughters.

## COUNT I
### (Violation of the National Environmental Policy Act)

**All Defendants Are Responsible for Substantially Changing the Project Scope and the Failure to Supplement The Environmental Assessment In Violation of NEPA.**

78.     Plaintiff NOVA hereby incorporates by reference paragraphs 1-77 above as if they were set out fully.

79.     In May 2021, Defendant FHWA issued a Revised Environmental Assessment.

80.     On June 29, 2021, Defendant FHWA issued a Finding of No Significant Impact concluding that the I-495 NEXT Project would result in no significant environmental impacts.

81.     At some point between September 2021 and June 2022, Defendants made significant modifications to the Project, including: (1) eliminating 16 small stormwater retention ponds; (2) expanding the number of lanes and flyover ramps, and the height of flyover ramps, in the vicinity of Live Oak Drive; (3) creating a massive new stormwater basin; (4) moving and narrowing Live Oak Drive; (5) replacing low, greenscaped sounds barriers with retention walls and sound barriers that exceed 45 feet in height and which directly abut the road; (6) moving an existing cell tower to a residential property next to a swim club; and (7) completely – and essentially irrevocably – deforesting close to 10 acres of mature trees.

82.     NEPA mandates that when an "agency makes substantial changes in the proposed action that are relevant to environmental concerns, the agency must prepare" a

supplemental environmental impact statement. *Great Old Broads for Wilderness v. Kimbell*, 709

F.3d 836, 854 (9th Cir. 2013) (citations omitted).[7] This obligation is not limited to where the

agency prepared an EIS in the first instance. *See, e.g., W. Watersheds Project v. Bureau of Land

Mgmt.*, 721 F.3d 1264, 1277-78 (10th Cir. 2013) (expressly noting that this obligation applies to

both an EA and an EIS).

83.     The new project design that Defendants VDOT, Transurban and CBE are

currently building does not constitute a "minor variation" of the sole Build Alternative

discussed in the EA, nor is it "qualitatively within the spectrum of alternatives" from that EA.

Accordingly, supplementation is required. *See* 40 C.F.R. § 1502.9(d); *California ex re. Imperial

Cnty. Air Pollution Control Dist. V. U.S. Dep't of Interior,* 751 F.3d 1113, 1126 (9th Cir. 2014).

84.     Defendant FHWA failed to take a hard look – or indeed, any look at all – at the

environmental impacts of the project design unveiled in June 2022.  For example, Defendant

FHWA should have, but did not, evaluate the effects that its stormwater management changes

would have, including:

   i.     The impacts of eliminating 16 stormwater retention ponds on flooding in
          nearby neighborhoods;

   ii.    The impacts of eliminating 16 stormwater retention ponds on water quality
          discharging to Scotts Run and the Potomac River, including loadings of
          sediments, nutrients, chlorides, sulfates, (for which pollutants the Potomac
          River already is water quality-impaired), oil and heavy metals;

   iii.   The extent to which the new, massive stormwater basin is likely to

---

[7]  Because of Defendants' ongoing requirement to supplement the EA and failure to do so,
Plaintiff's challenge to the actions post-EA is timely. *See* 23 U.S.C. § 139(l)(2); 23 C.F.R.
§771.130(c).

become a breeding ground for mosquitoes and mosquito-borne diseases, particularly in light of the fact that more than 7,500 students go to school and play sports within the 3-mile range that mosquitoes can travel;

iv. The extent to which the new, massive stormwater basin will increase the potential for flooding in surrounding neighborhoods, given that the basin will hold approximately 16 *million* gallons of water, all of which will be discharging through a single approximately 60" pipe;

v. The comparative efficacy of stormwater treatment between a small, fully vegetated stormwater management pond – which promotes infiltration and removal of pollutants – that is surrounded by mature trees and underbrush (which themselves also promote infiltration) versus a giant basin that cannot be fully vegetated and that allows untreated, polluted stormwater to exit through a large pipe;

vi. The impact of the increased flows from this giant basin – and the increased impervious surfaces from additional ramps and lanes – on a neighborhood that relies exclusively on septic systems for wastewater treatment, and whether the increased flows will result in septic system failures that will further increase pollutant loadings (nutrients) to Scotts Run and the Potomac River;

vii. The comparative erosion impacts as between a small, fully vegetated stormwater management pond that is surrounded by mature trees and underbrush (both of which promote infiltration) versus a 16 million gallon basin with a single, large outfall that exits at a stream already experiencing

significant erosion, and that is in very close proximity to two other major outfalls, one of which (another large pipe) drains the stormwater from the other side of the Beltway and one of which (a concrete culvert) drains stormwater from the Beltway to the north.

85.     Defendant FHWA also should have, but did not, evaluate the effects that the new lanes and flyover ramps would have on traffic-related air pollution, which are known to cause adverse respiratory, cardiovascular and immune system effects, especially in children. Defendant VDOT's own analysis shows that commute times on the non-toll general purpose lanes will increase in and around the Georgetown Pike & Beltway interchange unless and until Maryland completes its expansion project, including the construction of a new American Legion Bridge. *See* VDOT, Commonwealth Transportation Board Meeting, p. 5 (April 2021) (*available at* https://www.ctb.virginia.gov/resources/2021/april/7-i-495_express_lanes.pdf). Increased congestion means increased air pollution.  Yet Defendant FHWA failed to assess those impacts, particularly on the almost 2,000 children who go to school within a half mile of the interchange.

86.      Similarly, Defendant FHWA should have, but did not, evaluate the potential for the increased impervious surfaces from these additional ramps and lanes to increase flooding in nearby communities. Defendant FHWA also failed to consider whether the increased impervious surfaces would contribute to additional water quality issues in Scotts Run and the Potomac River.

87.     Defendant FHWA failed to take a hard look – or indeed, any look at all – at the safety impacts associated with moving and narrowing Live Oak Drive. In the summer months, hundreds of children walk or bike to Langley Swim Club, while many other neighbors walk to

the Scott's Run Nature Preserve entrance next to the Swim Club. Yet the new design eliminates the road's shoulder, as the retaining/sound walls directly abut the road – and neither side of the road has sidewalks, raising obvious safety concerns that should have been considered.  FHWA also failed to consider potential hazards for motorists, particularly school buses, as the narrowest part of the road will be right at the site of a sharp turn.

88.     Similarly, Defendant FHWA should have, but did not, evaluate the sound, light and air pollution impacts associated with ramps that reach almost 70 feet above the community, and visual impacts of retention walls and sound barriers that reach almost 50 feet.

89.     Defendant FHWA also should have, but did not, evaluate the effects that of moving a large cell tower onto residential property directly adjacent to a swim club where hundreds of children spend their summers.

90.     Finally, Defendant FHWA failed to take a hard look – or indeed, any look at all – at the environmental impacts associated with the extensive deforestation that was a direct outgrowth of its other design changes. Specifically, Defendant FHWA also should have, but did not, evaluate the effects that deforestation would have, including:

> i.   The combined air quality impacts of increased traffic and deforestation, particularly given that EPA has concluded that tall, thick roadside vegetation barriers provide the most effective approach to addressing traffic-related air pollution. See EPA, *Living Close to Roadways: Health Concerns and Mitigation Strategies* (*available at* [Living Close to Roadways: Health Concerns and Mitigation Strategies | US EPA](#)).
>
> ii.  The water quality impacts of increased traffic, coupled with deforestation of Live Oak Drive and the cloverleaf interchange (and thus reduced

infiltration);

    iii.   The erosion impacts of the deforestation of Live Oak Drive and the cloverleaf interchange, given that deforestation is one of the preeminent causes of erosion (*see, e.g.,* Earth Reminder, "How Does Deforestation Affect the Water Cycle?" (*available at* [How Does Deforestation Affect the Water Cycle? (earthreminder.com)](earthreminder.com)).

91.    Defendants similarly failed to consider measures that would reduce or mitigate harm to McLean residents, particularly children and the residents of Live Oak Drive from the significant changes made after completion of the EA.

92.    Defendant FHWA's failure to supplement their EA is a violation of NEPA.

**COUNT II**

**(Request for Declaratory Relief for Unconstitutional Delegation of Inherently Governmental Authority to a Private Party)**

93.    Plaintiff hereby incorporates by reference paragraphs 1- 92 above as if they were set out fully.

94.    NEPA places the legal duty to supplement an environmental assessment if changes are made that significantly affect the potential to affect the human environment on federal agencies and departments, including Defendant FHWA. See 42 U.S.C. §4332© and 40 C.F.R. § 1502.9(d)(1).

95.    However, in contravention of its duties under NEPA, Defendants FHWA and VDOT have illegally delegated to a self-interested private party, Defendant Transurban and its subsidiaries, 95 Express Lanes LLC and Capital Beltway Express LLC, the power to make changes in the project design unilaterally without reporting or oversight by Defendants FHWA or VDOT so long as the changes do not increase the time to complete, or the cost of, the project.

See Section 8.04(f) of Amended and Restated Comprehensive Agreement,

https://www.vdot.virginia.gov/ARCA_Amended_June_2017.pdf (("f) Following the Department's initial approval pursuant to this Section 8.04, the Concessionaire will have the right to amend, supplement or otherwise modify the Design Public Hearing Documentation, Design Documentation or the Construction Documentation or any part thereof, without the further approval of the Department" so long as those changes do not "(i) constitute a material change in the scope of the Work or Deviations from any of the Technical Requirements, (ii) result in increases in the time to achieve … Completion …, or (iii) … impose on the Department any new or increased costs, liabilities or obligations…").

96.     Defendants FHWA and VDOT have further unlawfully delegated to a self-interested private party, Defendant Transurban and its subsidiaries, 95 Express Lanes LLC and Capital Beltway Express LLC, the obligation to ensure compliance with NEPA. *See* Section 8.04(g) of Amended and Restated Comprehensive Agreement ("(g) In the event the Concessionaire's design differs from the schematic upon which the NEPA Documents were based, as between the Department and the Concessionaire, the Concessionaire will be fully responsible for all necessary actions, and will bear all risk of delay (except to the extent resulting from Delay Events) and all risk of increased cost (except to the extent resulting from Compensation Events), resulting from or arising out of any associated change in the Project Assets location and design, including (i) conducting all necessary environmental studies and preparing all necessary environmental documents in compliance with applicable Environmental Laws, …").

97.     On or about November 18, 2021, John Simkins, a duly authorized officer of Defendant FHWA's Planning, Environment, Realty, and Freight Team advised Debra Butler,

President of NOVA, that Defendant FHWA would not review the environmental effects of the changes to the project because its role was to simply approve any changes sent to it by Defendants VDOT or Transurban.

98.     Consistent with its hands off approach, despite repeated requests, Defendant FHWA has refused to meet and confer with counsel for NOVA prior to the filing of this case, as required by Rule 65 Fed. R. Civ. P.

99.     Defendant FHWA's NEPA regulations provide that changes to a project after an environmental assessment must be assessed to determine whether they have significant effects on the environment requiring either an EA or EIS. *See* 23 C.F.R. §771.130(c) ("where the Administration is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of the changes, new information or new circumstances.").

100.    In this case, however, Defendant FHWA has unlawfully delegated the assessment and decision on whether to perform additional environmental assessments to the applicant without Defendant FHWA's review or participation. Defendants FHWA and VDOT have violated the applicable NEPA regulations as applied to the I-495 NEXT Project.

101.    Counsel for NOVA has repeatedly requested Defendant Transurban to provide copies of any such environmental assessments of the effects of the changes on the human environment after the FONSI but to date they have not been provided.

102.    Defendant FHWA's delegation of its legal duties to review and supplement environmental assessments to Transurban, a private party with a self-interest in minimizing costs and delays to its project, violates the Constitution and laws of the United States.  See https://constitution.congress.gov/browse/essay/artI-S1-6-5/ALDE_00001324/ and *Carter v.*

*Carter Coal, Co.*, 298 U.S. 238 (1936).

## REQUEST FOR RELIEF

Plaintiff Northern Virginia Citizens Association respectfully requests that this Court:

A.     Enjoin Defendants and any entities working on their behalf from any further construction on portions of the Project that was designed after the issuance of the June 2021 Finding of No Significant Impact, specifically, enjoin any work in furtherance of moving Live Oak Drive, construction of the ramps that were not a part of the May 2021 EA (and therefore the environmental impact of the ramps was not analyzed) and further construction on the stormwater basin in the cloverleaf interchange referenced above and the outfall from that stormwater basin,

B.     Declare that Defendants have violated NEPA by failing to prepare the required supplemental environmental documents because the project changes as a whole have a significant effect on the human environment after having made significant changes to the design of the project that was approved in the June 2021 Finding of No Significant Impact,

C.     Enjoin Defendants and any entities working on their behalf from any further construction on any portion of the I-495 NEXT Project, or any other activities in furtherance of the project's financing, construction or operation until they fully comply with NEPA;

D.     Award Plaintiff NOVA its litigation costs, including attorneys' fees and any expert witness fees;

E.     Declare that Defendant FHWA has illegally delegated environmental review to a private party in violations of the laws and Constitution of the United States; and

F.     Grant such other and further relief as this Court deems just and proper.

Dated:  March 16, 2023                Respectfully submitted,

                                       /s/ John P. Rowley III_____
                                      John P. Rowley III (VA Bar No. 19804)
                                      SECIL Law PLLC
                                      1701 Pennsylvania Ave., N.W.
                                      Suite 200
                                      Washington, DC 20006
                                      (202) 417-8652
                                      jrowley@secillaw.com

                                      Edwin Donald Elliott Jr.*
                                      Earth & Water Law LLC
                                      1455 Pennsylvania Ave, N.W.
                                      Suite 400
                                      Washington, D.C. 20001
                                      (DC Bar number 912766)
                                      (202) 256-4149
                                      e.donald.elliott@earthandwatergroup.com

                                      John A. Sheehan*
                                      Earth & Water Law LLC
                                      1455 Pennsylvania Ave, N.W.
                                      Suite 400
                                      Washington, D.C. 20001
                                      (DC Bar No. 403838)
                                      (301) 980-5032
                                      john.sheehan@earthandwatergroup.com

                                      *Pro hac vice applications pending

                                      Counsel for NOVA Citizens Association

## <u>LIST OF ATTACHMENTS</u>

Attachment 1:  Declaration of Marisha Patel

Attachment 2:  Declaration of Siva Venuri

Attachment 3:  Declaration of Stephen A. Jasak

Attachment 4:  Declaration of Humair Qureshi

Attachment 5:  Declaration of Rahul Ravi

Attachment 6:  Declaration of Debra Butler