# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

NORTHERN VIRGINIA CITIZENS
ASSOCIATION,
                                        *Plaintiff*,

    v.

THE FEDERAL HIGHWAY
ADMINISTRATION, *et al.*,

                                        *Defendants*.

Case No. 1:23-cv-000356-LBM-IDD

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Northern Virginia Citizens Association ("NOVA") submits this memorandum in support of its Motion for Preliminary Injunction to enjoin the imminent and destructive construction activities Defendants are conducting for the I-495 Northern Extension Project ("the NEXT Project" or "the Project") to expand the Capital Beltway adjacent to Plaintiff's neighborhood in McLean, Virginia. If not enjoined, Defendants' activities will irreparably damage Plaintiff's neighborhood and the surrounding human and natural environment in violation of federal law. The Project's adverse effects already vastly exceed the scope of what the Virginia Department of Transportation ("VDOT") submitted and the Federal Highway Administration ("FHWA") approved.

Injunctive relief is necessary because Defendants collectively have unlawfully evaded and undermined the required environmental review process set forth in the National Environmental Policy Act ("NEPA," 42 U.S.C. §§ 4231 *et seq*.) by radically changing the

1

approved May 2021 design without proper public notice, opportunity for comment, or assessment of the dramatically more severe environmental, health and safety impacts. Project changes that were not subject to prior review include, but are not limited to:

- Destroying almost 10 acres of mature trees to make way for a massive stormwater pit in lieu of 16 small eco-friendly stormwater retention ponds scattered throughout the area;

- Building new flyover ramps and lanes that substantially increase impervious surfaces resulting in increased runoff of heavy metals from car and truck exhaust, worn tires, engine parts, brake linings and the like into the stormwater pit and eventually into the Potomac;

- Denuding Live Oak Drive of mature trees that served as a natural barrier to sound, light and pollution from the George Washington Parkway and I-495;

- Replacing the denuded mature trees with a planned 40+ foot high retaining wall / soundwall along most of Live Oak Drive with no replacement greenscaping; and

- Moving Live Oak Drive to accommodate additional ramps that likely are no longer needed and narrowing of Live Oak Drive to a mere 22 feet in width (the minimum allowable for a two-lane road), creating acute safety issues for residents, including children walking to the swim club on Live Oak Drive. NOVA was advised on Wednesday evening, March 29, 2023, that this work is about to commence.

Additionally, key underlying assumptions on which the Project was based have changed. Defendants made the majority of the Project design changes to make room for ramps and lanes that *Maryland* would build in *Virginia – i.e.,* to make the Project "Maryland-ready." But

Maryland is reconsidering its portion of the project in its entirety, including whether to build an expanded American Legion Bridge and widen I-495 and I-270 in Maryland. Transurban, the contractor selected for the Maryland project, and which also is the parent company of Defendant Capital Beltway Express, LLC ("CBE"), recently withdrew from that project, a development that – at a minimum – will substantially delay the Maryland project.[1] Two consolidated lawsuits are pending in the United States District Court for the District of Maryland – one by the Natural Resources Defense Council and Maryland Sierra Club and one by Plaintiff NOVA– challenging the environmental review of the now moribund Maryland plan.[2]

If Maryland does not go forward with its highway plan, then the entire I-495 NEXT Project will be mostly for naught. The Virginia's Public Private Partnership office concluded in 2015 and VDOT's own analysis shows that absent completion of the Maryland project, the I-495 NEXT Project *increases* commute times for anyone unwilling or unable to pay the Transurban tolls. In other words, Defendants' environmental devastation will have accomplished nothing more than moving a traffic bottleneck two miles down the road towards the American Legion Bridge. Before more damage to the environment is done and before more public money is spent on this "bridge to nowhere," further review, analysis, and public input is required.

Accordingly, because the size, scope and impacted areas of the Project have changed, because one, if not more, of the key underlying assumptions of the Project is no longer accurate, because imminent construction activities that will cause irreparable harm are scheduled to take

---

[1] *See*,
https://yourir.info/resources/a50955429d255a58/announcements/tcl.asx/3A614644/TCL_Maryland_Express_Lanes_Project_update.pdf.

[2] *The Northern Virginia Citizens Association v. FHWA et al.*(Case No. 8:22-cv-03336, D. Md.) and *Maryland Chapter of the Sierra Club et al. v. FHWA* (Case No, 8:22-cv-02597, D. Md*.).*

place, and because additional environmental review is required by federal environmental law, Plaintiff respectfully requests that the Court enjoin further construction activities until the required environmental review has been completed.

## I. INTRODUCTION

On or around 2018, VDOT entered into an amended contract with Defendant CBE to construct the I-495 NEXT Project, extending CBE's toll lanes on I-495 in Virginia approximately two miles from Old Dominion Drive to the intersection of the George Washington Memorial Parkway in the McLean area of Fairfax County, Virginia.[3]  To achieve any actual traffic congestion relief for the general public, however, the Project necessitated that the State of Maryland undertake a related project to widen the American Legion Bridge and widen the Capital Beltway on the Maryland side so that the benefits of the expanded road in Virginia would carry on into Maryland rather than halting at a bottleneck at the American Legion Bridge.

As required by law, the Original Project underwent environmental review including the preparation of a Revised Environmental Assessment ("EA") by VDOT dated May, 2021.  The Federal Highway Administration then reviewed the Environmental Assessment and approved the Project in a Finding of No Significant Impact ("FONSI") on June 29, 2021.  Almost a year after the completion of its Environmental Assessment, Defendants VDOT and CBE[4] disclosed for the first time in June 2022 that they had made radical changes to the Original Project – including

---

[3]  As set forth in the Complaint, on information and belief, the original I-495 toll lanes project resulted in significant financial losses to CBE that VDOT committed to backstop. Complaint at ¶44. The original contract did not grant CBE the right of way beyond Old Dominion Drive and the Project was originally submitted as a standalone Project. To avoid additional scrutiny by Virginia's PPP office, which concluded that the Project was not in the public interest without a coordinated plan by Maryland, however, the contract was amended to extend CBE's right of way to the American Legion Bridge. Complaint at ¶¶48-50.

[4]  The reference to actions taken by "Defendants" throughout refers to Defendants VDOT and CBE since FHWA took no apparent role after the issuance of the FONSI in June of 2021 and, on information and belief, did not review any changes to the plans.

new roads and flyovers which necessitated expanding the Project footprint and intruding further into the neighborhood of members of NOVA in order to accommodate that expansion. The redesigned Project also included the building of a massive new stormwater basin that results in significantly greater environmental impacts than had been disclosed during the EA process. None of these changes in project scope was previewed, discussed or analyzed in the draft or final EAs, or in subsequent documentation, all in violation of NEPA.

Now, within the past few weeks, Transurban has withdrawn as contractor for the Maryland project[5] and the State of Maryland has publicly stated that it may not go forward with its plan to widen the American Legion Bridge and add toll lanes to I-495 and I-270 in Maryland. Maryland's reconsideration suggests that this matter may present, in part, *the proverbial bridge to nowhere*. Defendants have begun construction on portions of the Project – ramps and flyovers – that (1) were not a part of the originally approved plan for this project and (2) may never be used.[6] But far from reconsidering the revised project scope – or at a bare minimum, at least re-analyzing anticipated traffic flows in light of the changes on the Maryland side, Defendants instead are forging ahead as rapidly as possible to build this bridge to nowhere.[7]

Defendants' unlawful expansion of the approved project without seeking further required environmental review necessitates that this Court step in now to preserve the *status quo* before further actions are taken that cannot be undone and will forever damage Plaintiff's neighborhood

---

[5] *See supra,* n. 1.

[6] *See,* https://www.washingtonpost.com/transportation/2023/02/11/virginia-maryland-beltway-express-lanes/. Even if Defendants contend that another use may be found for the ramps and flyovers intended to connect to the Maryland portion of the Project, the Project must still undergo further environmental review because of the change in intended use.

[7] *See* **Attachment 9**, VDOT "495 NEXT Project Update and Field Activity Report #12, (March 29, 2023) (discussing, among other things, additional destruction of trees and the imminent temporary movement of Live Oak Drive to facilitate moving utility lines for the "new, permanent alignment of Live Oak Drive").

and the human environment – as well as to prevent the absurd and very real possibility that hundreds of millions of taxpayer dollars will be spent building roads and flyovers that may never be used.

## II. STATEMENT OF FACTS.

### A. After Approval by FHWA, the Project Changed Significantly in Ways that Have Harmed the Citizens Association.

#### 1. The Approved Project

In May 2021, pursuant to NEPA, the Virginia Department of Transportation in coordination with the Federal Highway Administration issued a Revised Environmental Assessment studying the environmental impacts of and alternatives to the I-495 NEXT Project.[8] The EA evaluated only two alternatives: the "No Build Alternative" and the "Build Alternative." The No Build Alternative included no extension of the I-495 Express Lanes. The Build Alternative would extend the express lanes by approximately two miles, would add one ramp to the George Washington Memorial Parkway interchange, and would build 19 small stormwater basins to mitigate the erosion and pollution impacts of the increased impervious surfaces resulting from the new lanes and ramp. Only one build option was presented. On June 29, 2021, the FHWA Virginia Division approved a Finding of No Significant Impact for the Original I-495 Northern Extension Project, concluding that no environmental Impact Statement ("EIS") for the Project was required by NEPA.[9]

Around the same time, FHWA and the Maryland Department of Transportation State

---

[8] The Revised Environmental Assessment dated May 2021:
http://495northernextension.org/documents/studies/070121/i-495_next_revised_ea_-_may_2021.pdf

[9] FHWA's Finding of No Significant Impact:
http://495northernextension.org/documents/studies/070121/fhwa_finding_of_no_significant_impact.pdf

Highway Administration ("MDOT") were preparing an EIS, a fuller, more robust review than an environmental assessment, on Maryland's plan to widen and add toll lanes to a 15-mile stretch of the Beltway and I-270, between McLean, Virginia, and Gaithersburg, Maryland, including the addition of toll lanes over the American Legion Bridge crossing the Potomac River into Virginia.

## 2. VDOT's Misrepresentations to the Community – "We Feel Completely Duped."

NOVA, including individuals on both sides of the Beltway, closely followed the proposed plans and the explanations given to them by VDOT and its contractors, as well as engaging with VDOT representatives. Addressing the original approved plan for the Project, NOVA member Steve Jasak explained, "[u]nder that plan, our neighborhood would lose a handful of trees, but a relatively low sound wall with adequate greenscaping would make up for the loss." Jasak Dec. ¶ 1 (**Attachment 3** to Complaint).[10] Based on their review of the published information and based on the oral assurances of VDOT representatives, NOVA decided not to oppose the decision by the FHWA which allowed the Original Project to proceed. Jasak Dec. ¶ 1.

What the community was misled to believe would happen, and what actually happened, are vastly different. Community members have been devastated by the unexpected and horrific impacts on their lives and their property. As Lawton Street resident Andrew Churchill described, "the original plans from VDOT had nowhere near these levels of destruction: indeed, we feel completely duped." [11]

---

[10] **Attachments 1 – 6** are exhibits to the Complaint. **Attachments 7-9** are included as exhibits to this Memorandum.

[11] Letter of Declaration of Impact by Andrew Churchill, dated March 26, 2023, Attachment 8.

### a. Devastated Lives.

Steven Zhou and Alice Yang reside on Lawton Street in the community directly adjacent to the Project and are at retirement age. They received limited information from VDOT about the original plans but "many construction tasks were not included in the plan." Zhou Family Dec. at ¶ 12, **Attachment 7** to this Memorandum. They only recently learned that the July 2022 revised version of the design "added a new high-raised northbound highway lane toward Maryland which will be just outside of our Master Bedroom's windows which will cause pollution and noise." Zhou Family Dec. at ¶ 12.

The unexpected changes that VDOT and CBE are responsible for has "destroyed our normal lives" and "is horrible and a nightmare to us!" Zhou Family Dec. at ¶¶ 6, 12. The pictures attached to their declaration show how their property looked before the Project started and how it looks today; one example is included below.



Picture 3 – from our home backyard taken October 14, 2022 (before)

Picture 4 – from our home backyard taken March 25, 2023 (current)

[12]

The jarring changes would be devasting to anyone. The Zhou's have suffered irreparable harm including exposure to air pollution and toxins, and unmitigated noise. Zhou Family Dec. at ¶¶ 6, 9. Their son and his wife planned to move in with the Zhou's, allowing them to babysit

---

[12] Zhou Dec. at p. 4.

their three-month old grandbaby. Solely because of the conditions caused by Defendants, the Zhou's son and his family have to live elsewhere and hire a nanny to babysit their child.

Colonel Andrew Churchill also resides on Lawton Street and his situation is much like that of the Zhou Family. "The current situation is simply unbearable" and "[t]he mental stress is simply too much." Churchill Declaration, **Attachment 8** to this Memorandum, including before and after pictures of his property.

Similar accounts of the destructive impact of the unexpected Redesigned Project are detailed in the declarations of Marisha Patel, Humair Qureshi, and Rahul Ravi (respectively, **Attachments 1, 4, & 5** to the Complaint). Ms. Patel, for example, explains that her son is severely disabled: he is wheelchair bound, brain damaged with pervasive development delays, has life-threatening asthma and requires specialized care in all aspects of life. Since VDOT cut down the trees and demolished the sound wall, however, the Patel's master bedroom, living room, their son's bedroom, and their teenage daughter's bedroom and bathroom became visible to everyone driving on the I-495 and the George Washington Parkway exit, severely impacting their privacy and ability to access the outdoors. Dirt, dust, air pollution, and particulates cover their windows and cars. Now, because of their son's life-threatening asthma, they can no longer take him outdoors. Indeed, because of Defendants' actions, they need to revamp the home's HVAC system and install a new medical-grade filtration system.

### b. "This Is Not What Was Supposed To Be."[13]

Prior to the redesign, VDOT held several public information meetings where citizens raised concerns, including about retaining trees along Live Oak Drive. In June of 2020 a

---

[13] Butler Declaration, ¶ 9, **Attachment 6** to Complaint.

meeting was held with VDOT and the community, as well as local elected officials Delegate Murphy and Senator Favola.  Defendants assured the community and the elected officials that the project "would not destroy trees or the viewscape on Live Oak Drive."  Butler Dec. ¶ 5, **Attachment 6** to the Complaint.  Contrary to the plan for the Original Project and representation to the community and elected officials, Defendants completely denuded almost all of Live Oak Drive, eliminating any barrier between the community and the Beltway.  As Debra Butler explained in her Declaration, "[t]hat redesign took the wooded George Washington Parkway cloverleaf interchange, which provided a substantial treed barrier between our neighborhood and the light, noise and air pollution of the Beltway, and turned it into a massive stormwater pit that likely will become a breeding ground for mosquitoes."  Butler Declaration, ¶ 6.

Another meeting was held at the Langley Swim Club on December 16, 2022, after the devastation had occurred, again attended by Delegate Murphy and Senator Favola.  Both expressed their "shock" at what had transpired.  Butler Dec. ¶ 9.  Delegate Murphy said to VDOT, "[w]e walked the street together and were assured by VDOT that those trees were not in jeopardy of clear cutting." Butler Dec. ¶ 9.  Delegate Murphy stated that she was "heartbroken" and "this is not what we approved … this is not what was supposed to be."  Butler Dec. ¶ 9.

### 3.   The Unexpected, Unreviewed Significant Changes with Harmful Impacts.

The full scope of major changes from the originally approved plan to the expanded redesigned 2.0 Project are described in detail in the attached Jasak declaration, ¶¶ 6 -11, 30-32, 36-45, 61-63, 65 and 68-78, **Attachment 3** to the Complaint.[14]  None of these major changes nor their impacts on the human and natural environment was discussed or analyzed in the draft or

---

[14]  Community members, faced with these major significant changes to the project now invading their neighborhood, have sought on numerous occasions to work with the Defendants to address the unexpected impacts of the project. Despite the members' best efforts, those efforts have not been successful, necessitating the filing of this action.

final EAs.

### a. The Massive Expansion of the Stormwater Basin.

A year after FHWA made its finding of no significant impact that allowed the Project to proceed without a full environmental impact statement, Defendants disclosed on June 6, 2022, that they had made significant changes to the I-495 NEXT Project that would result in significantly greater environmental impacts than what had been identified during the EA process. (Jasak Dec. ¶¶ 2, 30-41). One major change was the expansion of a small stormwater pond into a massive stormwater basin. The Project plan as shown in the diagram below labeled "October 2020" showed a pond in a small portion of the forested interchange between the Beltway and the George Washington Parkway. The redesigned Project plan changed the small pond to much larger stormwater basin that occupied the majority of the interchange. What the Defendants underline actually constructed was even larger than the June 2022 diagram. Defendants clear-cut the entire interchange, removed every tree, and built a massive, deep stormwater basin.







15

The picture of the completely deforested area in the interchange between the Beltway and the George Washington Parkway, now turned into a deep dirt pit, demonstrates how far afield this Project has gone from its original plans and how destructive and reckless Defendants have been in assuming they have carte blanch to make whatever changes they desire.

---

15 VDOT, "Project Update Meetings: Construction and Design Information – 495 Express Lanes Northern Extension Project" (June 6, 2022).



Jasak Dec. at ¶ 6.

The Project also changed from conveying stormwater through sixteen smaller individual discharge conveyances into one extremely large conveyance that discharges the untreated runoff from a culvert in close proximity to the Potomac River. Jasak Dec. ¶¶ 49 – 56. Plaintiff does not believe there has been any review of the impact on the human or natural environment of this major stormwater discharge site. Jasak Dec. ¶ 56.

### b. The Road Expansion – Additional Lanes, Ramps and Flyovers.

In addition to the massive stormwater basin described above, the redesign changes in the I-495 NEXT Project 2.0 include a total of five cloverleaf flyover ramps and one wishbone-shaped ramp in the vicinity of Live Oak Drive in McLean, Virginia, with another wishbone-shaped ramp on the other side of the Beltway. These new ramps connect to and from the George

Washington Memorial Parkway and the I-495 Northern Extension Express Lanes, as well as realigning existing ramps to and from the Beltway general-purpose lanes to the George Washington Memorial Parkway.  Jasak Dec. at ¶¶ 7-8, 30-32, 61-63.

Even the diagrams *supra* at 11 fail to show the full magnitude of the changes, however. VDOT's redesign pushes its ramps 36 feet towards Live Oak Drive to make room for the ramps that *Maryland* (Transurban) would build *in Virginia* – a fact that Virginia never disclosed in the Environmental Assessment.  VDOT's illustration below shows Maryland's build in Virginia in yellow, orange and purple.  Plaintiffs believe that virtually all of the design changes made by VDOT were done to accommodate these Maryland (Transurban) built lanes, ramps and flyovers – and specifically to facilitate the entrance and exit of trucks from the toll lanes, as trucks were to be allowed on the toll lanes in Maryland but are not allowed in Virginia.



16

[16] VDOT, "Response to Questions from Supervisor Foust, Senator Favola and Delegate Murphy dated June 8, 2022," p. 21 (July 29, 2022).

14

By shifting the soundwall and ramp locations 36 feet closer to Live Oak Drive, Defendants' I-495 NEXT 2.0 Project essentially eliminates any possibility of greenscaping between the sound wall and the road as originally promised. With Transurban's exit from the Maryland project and that project currently on ice, these new ramps in particular are a road to nowhere.[17] More importantly, Plaintiff has been unable to locate any review of the impacts of these expanded ramps and flyovers on the human environment as required by NEPA.

### c. Expanding the Project Further Into Plaintiff's Neighborhood Destroys Trees that Were Promised to be Protected and Creates Safety Issues.

Because the footprint of the Original Project expanded to accommodate ramps and interchanges, a redesign was necessary. The Redesigned Project, without environmental review, encroached further into the Plaintiff's neighborhood, moving the sound wall as much as 36 feet closer to the neighborhood and resulting in the destruction of acres of mature trees which had previously shielded the neighborhood from the light, noise and air pollution of I-495. It also resulted in a need to relocate and narrow Live Oak Drive, the only road in and out of the community and the road along which children walk to Cooper Middle School and the local swim club. The impact of the relocation of Live Oak Drive is discussed below.

### B. Imminent Irreparable Harm as a Result of the Expanded Redesigned Project

#### 1. The Harms Already Inflicted on the Community

Unfortunately, major irreparable harm has already been inflicted on the community and the environment as Defendants ignored the Project as approved while literally plowing ahead with their own unchecked and unrestrained land clearing activities. The massive expansion of the stormwater basin offers a clear example of the significant environmental impacts that have

---

[17] At a bare minimum, Defendants should have re-analyzing anticipated traffic flows in light of the changes on the Maryland side. *See, No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of Transp.,* 60 F.4th 794 (4th Cir. 2023) (agencies took a "hard look" at the traffic issue due to change in forecast since initial evaluation).

already resulted from Defendants' disregard of their environmental review responsibilities under NEPA. The attached declarations explain the devasting impact these changes have had on the physical and mental health of community members, while the attached Jasak declaration, **Attachment 3** to Complaint, ¶¶ 46-60, explains the devastating impacts on the environment from Defendants' new plan to consolidate all the runoff into one conveyance whose outfall is a mere 0.2 miles from the Potomac River.

### 2. The Imminent Irreparable Harms That Will Occur If the Project is Not Enjoined.

#### a. Moving Live Oak Drive Creates a Safety Hazard and Causes the Loss of Land that was Promised to Be Greenscaped and Serve as a Buffer.

Additional irreparable harm to citizens and the human environment is imminent if Defendants are not prevented from moving ahead with their redesigned Project. Indeed, rather than pausing to consider the impacts of the Transurban withdrawal and Maryland reconsideration on their Project design, Defendants instead are plowing ahead with their "Maryland-ready" Project, including its plans to relocate Live Oak Drive to make room for the new (likely unnecessary) ramps and flyovers that were not part of the approved design. On March 29, 2023, VDOT announced that it is continuing to clear trees and remove sounds walls, as well as beginning temporary paving work on Live Oak Drive, part of its plan to tear up the road and reconstruct it fifteen feet further into the neighborhood. These latter actions will endanger anyone walking along the road, which is frequently used by children walking to school or to the swim club.  Jasak Dec. ¶ 63.  The proposed change to Live Oak Drive poses a safety issue because in the summer months hundreds of children walk or bike to the Langley Swim Club on Live Oak Drive. Jasak Dec. ¶ 64.  No consideration or discussion with the community has taken place on this issue.

### b. The Additional Lanes, Ramps and Flyovers, if Constructed, Will Have Numerous Harmful Impacts.

One of the major changes from the original Project to the redesigned Project is the addition of lanes, ramps and flyovers that were not included in the original Project. This major change would bring more cars and trucks closer to the community, causing irreparable harms and impacts on the human and natural environment that have not been studied and analyzed. The direct impacts from the redesigned Project will be born most directly by the Live Oak Drive and River Oaks communities[18], by the approximately 7,500 schoolchildren who attend schools in close proximity to the Project, by the Langley Swim Club, and by other adjacent residential communities. The sensitive environmental resources in the area, including Scotts Run Nature Preserve and the Potomac River, will also be impacted. NOVA members will experience noise and light pollution associated with the newly planned flyover ramps which, when constructed, are expected to be located as high as sixty-nine (69) feet above their properties. Jasak Dec. at ¶¶ 69-70.

Defendants' addition of multiple new lanes and flyover ramps – none of which was considered in the EA process that formed the administrative record for the Finding of No Significant Impact – is also likely to increase concentrations of traffic-related air pollution which can causes adverse respiratory, cardiovascular and immune system health effects in Plaintiff's members and the residents of other communities located near the Project.[19] Defendants FHWA

---

[18]  River Oaks is on the opposite side of the Beltway, and the location of the Zhou and Churchill families.

[19]  *See, e.g.,* Rob McConnell, Talat Islam, Ketan Shankardass, Michael Jerrett, Fred Lurmann, Frank Gilliard, Jim Gauderman, Ed Avol, Nino Kunzli, Ling Yao, John Peters & Kiros Berhane. "Childhood incident asthma and traffic-related air pollution at home and school," *Environ. Health Perspectives* 118(7): 1021-6 (July 2010) (Asthma risk increases with childhood exposure to traffic-related pollution at homes and schools); Shohreh F. Farzan, Rima Habre, Phoebe Danza, Frederick Lurmann, W. James Gauderman, Edward Avol, Theresa Bastain, Howard N. Hodis & Carrie Breton. "Childhood traffic-related air pollution and adverse changes in subclinical atherosclerosis measures from childhood to adulthood," *Environ. Health* 20(1): 44 (April 2020) (Increased childhood exposure to traffic-related air pollution resulted in statistically significant increases in carotid artery intima-media thickness

and VDOT failed to conduct any analysis of this harmful air pollution, even though almost 1,900 Virginia students attend schools within a half-mile of the locus of the Project's scope change – and the 7,500 students attend school within two miles of the Project.[20]

The new ramps planned by Defendants will also increase surface water run-off into the Scotts Run community and Live Oak Drive community and exacerbate storm water management issues. The impacts from the expanded scope of the Project has drastically changed the stormwater management process, and the increased pollution and erosion impacts from those changes have not been analyzed. In the event that Maryland abandons its proposed project and decides not to expand the American Legion Bridge and widen the Maryland Beltway, the traffic flow and resultant air pollution in the area near the homes of NOVA members will materially increase from that which was analyzed in VDOT's Revised Environmental Assessment and approved by FHWA. If the Project proceeds as planned by Defendants, traffic congestion in the area will increase in different, more populated areas and residential areas. Defendants have a legal obligation to evaluate those impacts but have failed to do so.

## III.   ARGUMENT

### A.  The Defendants Have Violated the National Environmental Policy Act.

The issuance of a determination by FHWA that a project may proceed does not

---

(CIMD), a marker for early cardiovascular disease); W. James Gauderman, Edward Avol, Fred Luhrmann, Nino Kuenzli, Frank Gilliard, John Peters & Rob McConnell. "Childhood asthma and exposure to traffic and nitrogen dioxide," *Epidemiology* 16(6): 737-43 (2005) (Childhood exposure to traffic-related pollution results in adverse effects on respiratory health of children).

[20]  Student enrollment at schools in the vicinity of the Project: Cooper Middle School (1054 students; 770 feet from interchange); Churchill Road Elementary School (608 students; 1/2 mile from interchange); St. Luke's Catholic School (219 students; less than ½ mile from interchange); Langley High School (2107 students; 1.5 miles from interchange); The Langley School (481 students; 1.5 miles from interchange); Franklin Sherman Elementary School (337 students; 1.6 miles from interchange); McLean Country Day School (265 students; 1.8 miles from interchange); McLean High School (2429 students; 2.0 miles from interchange).

necessarily terminate an agency's requirement for environmental review. Under NEPA, an agency must prepare a supplement to an Environmental Assessment when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii); *Loper Bright Enters. V. Raimondo*, 544 F. Supp. 3d 82, 122 (D.D.C. 2021). If the new information shows that the remaining action will affect the quality of the environment 'in a significant manner or to a significant extent not already considered,' "a supplemental must be prepared. *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330, 362 U.S. App. D.C. 276 (D.C. Cir. 2004) (quoting *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 374 (1989)).[21]

Courts have interpreted this requirement to mandate that, "[i]f the final action departs substantially from the alternatives described in the draft EIS, however, a supplemental draft EIS is required." *Russell County Sportsmen v. U.S. Forest Serv.,* 668 F.3d 1037, 1045 (9th Cir. 2011). NEPA requires that the analysis of "significant effects on the human environment" must be completed "before any irreversible and irretrievable commitment of resources" are made by the agency. *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

As described in the Statement of Facts above, the changes that have occurred after approval of the Original Project – the vast expansion of the stormwater basin and the resulting additional stormwater flows, the addition of ramps and flyover and the expansion further into the neighborhood, forcing the relocation of Live Oak Drive – are all major significant changes that are required to undergo review of their effect on the human environment. VDOT and FHWA must analyze the stormwater impacts from the basin and the air pollution from the additional

---

[21] This obligation is not limited solely to where the agency prepared an EIS in the first instance. *See, e.g., W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1277-78 (10th Cir. 2013) (expressly noting that this obligation applies to both an EA and an EIS).

ramps and the safety issues that would result from the relocation of Live Oak Drive. Because the State of Maryland may no longer build the related project it had proposed, how that changes traffic flow and impacts in Virginia (as well as the need for additional ramps) must also undergo review.[22]

The Fourth Circuit recently clarified the standard for judicial review when an *agency* determines that changes to a project do not cause the project as a whole to rise to the level of a federal action that would "significantly affecting the quality of the human environment" 42 U.S.C. §4332(C) and thus neither a supplemental EA or an EIS need not be prepared. *No Mid-Currituck Bridge-Concerned Citizens and Visitors Opposed To The Mid-Currituck Bridge; North Carolina Wildlife Federation v. No.Car.. DOT et.al.*, No. 22-1103 (4th Cir., Feb. 23, 2023). The court wrote:

> First, we must consider "whether the agency took a hard look at the proffered new information." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). "If the agency concludes after a preliminary inquiry that the environmental effect of the change is clearly insignificant, its decision not to prepare [a supplemental EIS] satisfies the hard look requirement." *Save Our Sound OBX*, 914 F.3d at 222.
>
> Second, if the agency did take a hard look, we determine whether its "decision not to prepare a supplemental EIS was arbitrary or capricious." *Hughes River*, 81 F.3d at 443. We don't defer to the district court. *Id.* But we do defer to the agency if its decision turned on a "factual dispute . . . which implicate[d] substantial agency expertise." *Marsh*, 490 U.S. at 376. Slip op. at 10.

The Court upheld the agency's decision on the facts of that case based on far more significant studies and analyses of the changes than were conducted here. For example, the agency there conducted a study of reduced traffic patterns and concluded that despite the reduced benefits, it made sense to go ahead with the project. As far as Plaintiff has been able to

---

[22] Supplement is required if new information "provides a *seriously* different picture of the environmental landscape." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002).

determine, no similar study was conducted here.  Prior to filing this case, Plaintiff repeatedly asked Defendants to provide any such analyses that had been conducted and provided to the state and federal agencies regarding the significance of the changes in terms of effects on the human environment, and none have been provided.  Plus, the Fourth Circuit emphasized that it deferred to the *agency's* expertise, not a private party such as CBE with a financial interest in avoiding funding additional analyses.

Defendants are currently plowing ahead with their expanded I-495 NEXT Project 2.0 in the complete absence of any NEPA analysis on the Project's impacts. The plan in the final EA left Live Oak Drive in its current form and location. The Project 2.0 moves Live Oak Drive to the west and narrows part to a mere 22 feet, the minimum allowable for a two-lane road, all to accommodate the enlarged and expanded project and additional ramps.  Defendants have already denuded Live Oak Drive of trees and other vegetation, increasing stormwater pollution and subjecting the neighborhood to additional sound, light and air quality pollution and erosion. Defendants demonstrate their complete disregard not only for the affected communities, but also for their environmental obligations under NEPA.

Under NEPA, the reviewing agencies must "take a hard look at the problem." *Sierra Club v. Van Antwerp,* 661 F.3d 1147, 1154, (D.C. Cir. 2011). "Although the contours of the 'hard look' doctrine may be imprecise," a court must at a minimum "'ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 93, (D.C. Cir. 2006) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983)). A "hard look" includes "considering all foreseeable direct and indirect impacts . . . . [It] should involve a discussion of adverse impacts that does not

improperly minimize negative side effects." *N. Alaska Env't Ctr. v. Kempthorne,* 457 F.3d 969, 975 (9th Cir. 2006) (internal quotation marks and citation omitted).

Here, FHWA had the obligation to review the revised plan and additional activities and determine if they created a significant impact. *No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of Transp.,*60 F.4th 794 (4th Cir. 2023) (agencies took a hard look at new information to determine whether supplementation was required). Not only did VDOT fail to take a "hard look" at the redesigned and expanded project, FHWA told Debra Butler that its only role was to ensure that VDOT provided with the appropriate documents and that FHWA was to *assume* that all the information provided to VDOT and its vendors was accurate and that FHWA was a "rubber stamp" for the information provided by VDOT. Butler Dec. ¶ 11. FHWA failed to take any look, much less a hard look.

### B. The Standard of Review for a Preliminary Injunction

Rule 65(a) of the Federal Rules of Civil Procedure sets forth the standards for consideration of motion for preliminary injunctions. Motions for preliminary injunctions are governed by a multi-factor test to determine whether plaintiffs have shown: (1) a likelihood of success on the merits; (2) that they are likely to suffer irreparable injury absent such relief; (3) that the balance of the equities tips in plaintiffs' favor; and (4) that the injunction is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Centro Tepeyac v. Montgomery Cnty*, 722 F.3d 184, 190-91 (4th Cir. 2013); *MicroStrategy, Inc., v. Motorola, Inc*., 245 F.3d 335, 339 (4th Cir. 2001); *Winter v. NRDC,* 555 U.S. 7, 22 (2008).

Because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted

on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, a party must present a *prima facie* case but need not "prove his case in full at a preliminary-injunction hearing." *Id*. Indeed, the U.S. Supreme Court has cautioned against "improperly equat[ing] 'likelihood of success' with 'success'" when considering requests for preliminary injunctions. *Id.* at 394.

**C.     Plaintiff Meets The Requirements For A Preliminary Injunction.**

   **1.   There Is A Substantial Likelihood That Plaintiff Will Prevail On The Merits.**

As described in the Argument section above, the test for whether determining when an agency must conduct a supplemental review is straightforward: when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. The Jasak Declaration, **Attachment 3** to Complaint, details the significant changes this project has undergone since the review process ended in June 2021 and the FHWA issued its finding of no significant impact. The new circumstances and changes are described in VDOT's and Transurban's own documents, are seen in VDOT's pictures and diagrams and schematics of the Project, and in the front-line account of Mr. Jasak.

Supplementation can only be avoided in limited circumstances: "supplementation is not required when two alternatives are satisfied: (1) the new alternative is a minor variation of one of the alternatives discussed in the draft EIS, and (2) the new alternative is qualitatively within the spectrum of alternatives that were discussed in the draft EIS." *California ex re. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of Interior,* 751 F.3d 1113, 1126 (9th Cir. 2014) (emphasis in the original) (internal quotation marks and citations omitted). Neither condition is met here. Supplementation is required.

Plaintiff is likely to succeed on the merits because Defendants have done precisely what NEPA's implementing regulations state they cannot do – they issued an EA and a FONSI based

on a highly circumscribed project scope and then unveiled a new, broader project scope with far more significant environmental impacts – but without ever analyzing or considering those environmental impacts. *See, e.g., Deukmejian v. NRC,* 751 F.2d 1287 (D.C. Cir. 1984) ("The agency's obligations under NEPA do not cease once the EIS has been prepared, however: both federal case law and regulations recognize a continuing duty to supplement EISs which have already become final whenever the discovery of significant new information renders the original EIS inadequate"); *West v. Secretary of the Department of Transportation,* 206 F.3d 920, 925 (9th Cir. 2000) (an agency cannot "merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable.").

Even a cursory review of VDOT's October 2020 project visualization as compared to its June 2022 project visualization (*supra* at 11) makes clear that the expanded redesigned project 2.0 includes additional ramps and lanes. Those new ramps and lanes will increase impervious surfaces, resulting in increased runoff in neighborhoods and increased discharges of pollutants to the Potomac.[23] They will increase the number of vehicles and the air pollution in the vicinity of the project expansion. And they cause the Beltway to encroach far closer to neighborhoods than under the project proposal set forth in the EA.

In summary, the significant new circumstances and information require additional environmental review and demonstrate that Defendants have violated NEPA and that Plaintiff NOVA is likely to succeed on the merits of its claim.

---

[23] Runoff, sediment contamination and erosion also will be exacerbated by the I-495 NEXT Project 2.0 plan to replace planned stormwater piping systems with a retention basin created by stripping the trees and vegetation from the existing cloverleaf interchange between the George Washington Memorial Parkway and I-495.

**2. Plaintiff Is Highly Likely To Suffer Irreparable Injury If The Court Does Not Issue A Preliminary Injunction.**

On January 31, 2023, people living on Live Oak Drive found flyers in their mailboxes – titled "Notice to Live Oak Residents" – informing them Live Oak Drive was going to be moved so that Defendants could push their expanded project 2.0 into their neighborhood. (See Jasak Dec. at ¶ 4.) The residents who followed the I-495 NEXT Project closely from the outset did not know that their street – the key street into and out of their neighborhood – was about to be moved, pushing the Beltway expansion project further into their neighborhood, denuding the street of mature trees and taking land from residents to make that happen. The Original Project in the final EA left Live Oak Drive in its current form and location. And, as recently as March 29, 2023, VDOT announced that they are proceeding apace with moving the road, notwithstanding recent developments in Maryland. Plaintiff will be irreparably harmed by the unlawful expansion into and destruction of their neighborhood if the construction activities are not enjoined until the environmental review required by federal law is completed.

To satisfy the irreparable injury requirement, a plaintiff need only demonstrate that absent a preliminary injunction, it is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). A party seeking a preliminary injunction must make a clear showing of "actual and imminent" irreparable harm in the absence of injunctive relief. *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). "[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy," *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir.), vacated on other grounds, – U.S. –, 138 S.Ct. 2710 (2018), typically when monetary damages "are difficult to ascertain or are inadequate," *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,* 193 F.Supp.3d

556, 574 (E.D. Va. 2016).

Unfortunately, irreparable harm has already occurred to the environment as a result of Defendants' failure to comply with their obligations under NEPA. *See supra at* pp. 7-15; Declarations of Jasak; Butler; Patel; Qureshi; Ravi; Venuri (respectively, **Attachments 3, 6, 1, 4, 5 & 2** to Complaint) and Zhou and Churchill (respectively, **Attachments 7 & 8** to this Memorandum). NOVA asks this Court to prevent *further* irreparable harm to Plaintiff's neighborhood that is imminent. The experiences of NOVA members Rahul and Emily Ravi (**Attachment 5** to Complaint) preview what more neighbors will experience absent an injunction. They live at 710 Live Oak Drive, where work has already begun. Their property directly overlooks the on and off-ramps connecting the Beltway to the George Washington Memorial Parkway. Until November 2022, the Ravi's view of the corridor was protected by numerous trees that blocked the sounds and light of the interchange from their home. Since then, however, Defendants have removed the natural barriers, exposing their home directly to the adverse effects of constant traffic and construction noise. There have been numerous occasions at night – and never with prior notice – where construction has carried on past midnight, causing loss of sleep, adverse health effects and negative impacts on their work.

The Ravi's, as well as numerous other NOVA members like Zhous and Churchills (respectively, **Attachments 7 & 8** to this Memorandum) and others in the surrounding community, have already been impacted beyond their expectations because Defendants have expanded the scope of the project beyond what was reviewed and approved by the FHWA. Defendants are moving forward rapidly now on their revised – and unreviewed – plan that destroys and rebuilds Live Oak Drive in a new location and that constructs a 40 plus foot high retaining wall/sound barrier where formerly there were beautiful, mature trees and abundant

vegetation.[24]  Plaintiffs' injuries from Defendants unlawful actions are already clear and
concrete.  Action is needed now to prevent further imminent and irreparable injury.

Absent a Preliminary Injunction and injunction, Plaintiff's members will suffer
immediate, concrete and irreparable harm.

### 3.   The Potential Damage to Defendants Is Far Outweighed By The Injury To Plaintiffs And By The Public Interest.

The harm to the Plaintiff's members if construction is not paused substantially outweighs
any injury to Defendants.  Moreover, Defendants should not be heard to allege injury about a
situation they have caused by their unlawful actions and complete disregard of their obligations
under the National Environmental Policy Act.

Any harm Defendants may incur if work is deferred until this Court can hear the case on
the merits is also only speculative.  VDOT's own documents show that it is dependent on MDOT
for the "tie ins" to its expanded lanes and ramps.  Yet, Defendant Transurban has pulled out of
the project, leaving Maryland without a design-builder. And Maryland's project currently is
subject to litigation, as well as being on hold while the new administration reconsiders whether
or not to do the project.[25] Even before the reconsideration, Maryland's project was several years
behind VDOT's in planned funding and implementation.[26]  Not only will Defendants not be
injured by a decision to pause the project, they may also actually benefit from it.  Better to learn

---

[24]  Defendants appear to be acting with reckless disregard for the communities they are supposed to serve. In recent months, the community feels their actions are deliberate, as if Defendants hope to make life in the community so miserable that NOVA Citizens Association will stop complaining about the I-495 NEXT Project 2.0 and the lack of accompanying environmental consideration and simply be grateful for a giant wall towering over their homes, because it will be better than seeing, hearing and breathing nothing but constant traffic.  Jasak Dec. ¶ 22.

[25] *See Maryland Chapter of the Sierra Club et al. v. Federal Highway Administration et al.*, Case No. 22-cv-2597 (D.C. MD) (filed October 11, 2022); WTOP, "Moore Pledges to Steer I-270/I-495 Traffic Relief Efforts in a New Direction," (December 16, 2022) (*available at* Moore pledges to steer I-270/I-495 traffic relief efforts in a new direction - WTOP News).

[26] *See, e.g.,* FHWA, Maryland Division, *Record of Decision,* pp. 46-47 (August 25, 2022) (showing, based on anticipated permitting, that no work would begin on the Maryland portion of the project until 2024 at the earliest).

now whether the proposed roads and ramps will ever be used before building roads to nowhere.

Defendants' I-495 NEXT Project 2.0 – when complete – will merely move the existing traffic bottleneck on the Beltway by about two miles – from Tysons Corner and the Dulles Access Road up to the Georgetown Pike and George Washington Memorial Parkway exits. No meaningful traffic relief will occur unless and until Maryland builds a replacement for the American Legion bridge. Indeed, VDOT's own analysis shows that absent the Maryland build, its I-495 NEXT Project (Original Project *and* Project 2.0) will make commute times *worse* for everyone unwilling or unable to pay Transurban's tolls.[27] Moving the bottleneck by those two miles in fact will have *adverse* consequences on the Plaintiff's members. The Georgetown Pike/I-495 interchange is in close proximity to numerous schools.  As noted above, almost 1,900 Virginia students attend schools within a half-mile of the locus of the I-495 NEXT Project 2.0 – and 7,500 students attend school within two miles; all of them will be subject to additional adverse traffic-related air pollution.

Given the minimal impacts an injunction will have on traffic, the existing harm to Plaintiff's members, and the adverse impacts on children's health that would result from the I-495 NEXT Project 2.0 being constructed while the Maryland project is on hold, the balance of the equities falls on the side of granting an injunction. The balance of the equities tips even further in favor of an injunction because Defendants should not be rewarded for their complete disregard of their environmental obligations under NEPA, nor for their disregard of the impacts their actions have on real communities and real people.

---

[27] See VDOT, Commonwealth Transportation Board Meeting, p. 5 (April 2021) (available at https://www.ctb.virginia.gov/resources/2021/april/7-i-495_express_lanes.pdf).

**4. Either No Bond or a Nominal Bond is Appropriate in This Case.**

Many courts hold that where a nonprofit such as NOVA has filed suit, no bond need be posted. *Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (affirming no bond for an environmental non-profit because "special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute"); *See, e.g.*, *Pharm. Soc'y of State of New York, Inc. v. New York State Dept. of Social Services*, 50 F.3d 1168, 1174 (2d Cir. 1995) (noting that "an exception to the bond requirement has been crafted for, *inter alia,* cases involving the enforcement of "public interests" arising out of "comprehensive federal health and welfare statutes"); *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, No. 3:12-CV-00682-TBR, 2013 WL 5278236, at *5 (W.D. Ky. Sept. 18, 2013) (imposing no bond because "Plaintiffs seek to vindicate the public interest served by NEPA"); *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) ("It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest."); *Sierra Club v. Army Corps of Engineers*, 399 F. Supp. 2d 1335, 1349 (M.D. Fla 2005) (requiring no bond in case brought by one of the present Plaintiffs); *S. Appalachian Biodiversity Project v. U.S. Forest Serv.*, 162 F. Supp. 2d 1365, 1367 (N.D. Ga. 2001) (requiring no bond in recognition that "plaintiff is a non-profit organization").

The law of this Circuit similarly holds that where circumstances warrant it, a nominal bond may suffice. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 n. 3 (4th Cir. 1999). And courts have long declined to impose more than a nominal bond when doing otherwise would frustrate public interest litigation. *See, e.g., Red Wolf Coal. V. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 806-07 (E.D.N.C. 2016) (imposing a $100 bond where plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful

judicial review were the bond required more than nominal); *Defs. Of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 560–61 (D. S.C. 2021) (same, imposing a $100 bond); *Bragg v. Robertson*, 54 F. Supp. 2d 635, 652–53 (S.D. Va. 1999) (imposing a $5,000 bond). *See also Davis v. Mineta, 302 F.3d 1104, 1126 (10th Cir. 2002)* ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered."); *Ala. ex rel. Baxley v. Corps of Eng'rs,* 411 F. Supp. 1261, 1276 (N.D. Ala. 1976) (setting nominal bond of $1.00 for non-profit environmental plaintiffs); *Nat. Res. Def. Council v. Morton,* 337 F. Supp. 167, 169 (D.D.C. 1971) (concluding that a substantial bond would "stifle the intent" of NEPA by precluding citizen enforcement, and setting bond at $100).

Plaintiff is a non-profit local community organization with limited resources seeking this Court's assistance to require Defendants comply with a mandatory statutory duty before the issue becomes moot. A nominal bond is appropriate in these circumstances.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's request for a Preliminary Injunction against Defendants and those in active concert or participation with them, and grant the following relief:

1. Enjoin the I-495 Northern Extension Project until environmental review and analysis is conducted on changes to the Project that have been made since FHWA's Finding of No Significant Impact on June 29, 2021. This relief requires that Defendants fully analyze all changes and redesigns after the original finding by FHWA and provide public notice, opportunity for comment, and assessment of the environmental, health and safety impacts as is required under NEPA.

2. Grant any other relief that this Court deems just and appropriate.

March 31, 2023                          Respectfully submitted,

                                          /s/ John P. Rowley III
                                        John P. Rowley III
                                        (VA Bar No. 19804)
                                        SECIL Law PLLC
                                        1701 Pennsylvania Ave., N.W.
                                        Suite 200
                                        Washington, D.C. 20006
                                        T: +1.202.417.8652
                                        E: jrowley@secillaw.com

                                        Edwin Donald Elliott
                                        (D.C. Bar number 912766)
                                        Earth & Water Law LLC
                                        1455 Pennsylvania Ave, N.W.
                                        Suite 400
                                        Washington, D.C. 20001
                                        e.donald.elliott@earthandwatergroup.com
                                        Telephone: 202-256-4149
                                        *Pro hac vice motion granted 3/20/2023*

                                        John A. Sheehan
                                        (D.C. Bar No. 403838)
                                        Earth & Water Law LLC
                                        1455 Pennsylvania Ave, N.W.
                                        Suite 400
                                        Washington, D.C. 20001
                                        john.sheehan@earthandwatergroup.com
                                        Telephone: 301-980-5032
                                        *Pro hac vice motion granted 3/20/2023*

                                        *Counsel for Northern Virginia Citizens
                                        Association*

**ATTACHMENTS**

(Note – Attachments 1-6 are exhibits to the Complaint)

7. Attachment 7 - Declaration of Zhou Family

8. Attachment 8 - Declaration of Churchill Family

9. Attachment 9, VDOT "495 NEXT Project Update and Field Activity Report #12, (March 29, 2023)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2023, I electronically filed the foregoing Memorandum in Support of Motion for Preliminary Injunction by using the CM/ECF system, which served all counsel of record registered with the CM/ECF system for this case.

   /s/ John P. Rowley III
John P. Rowley III