**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **NORTHERN VIRGINIA CITIZENS ASSOCIATION, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:23-cv-00356-LMB-IDD** |
| | ) | |
| **FEDERAL HIGHWAY ADMINISTRATION,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMMONWEALTH DEFENDANTS' OPPOSITION**

**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

**PAGE**

FACTS ...................................................................................................................1

The Project ..........................................................................................................1

The Environmental Assessment Was Comprehensive and Considered the Types of Harm Now Alleged By NVCA .............................................................................3

All Ramps at the GWMP Interchange Are Within the EA's Assessment and Will Serve Traffic in the 495 Corridor; There are No "Proverbial Bridges to Nowhere"...............6

Stormwater Management Was Included in the EA ..............................................7

Live Oak Drive Has Been Planned for Partial Realignment Since 2019 .............8

VDOT Has Regularly and Timely Provided Project Information to the Public, Including NVCA ................................................................................................10

The Costs of Delay to the Commonwealth and Public Would Be Substantial.....11

STANDARD OF REVIEW ....................................................................................12

ARGUMENT .........................................................................................................13

I.     NVCA Has Not Shown a Likelihood of Success on the Merits. .............13

A.   All Impacts of Which NVCA Complains Were Considered in the Revised Environmental Assessment. ..............................................................13

B.   The Re-evaluation Process of 40 CFR § 1502.9(d)(1)(ii) Does Not Apply. ..........15

C.   VDOT and the FHWA Exceeded the Review Requirements of NEPA. ..............15

D.   Plaintiff Cannot Prevail Because They Do Not Have Standing to Bring this Action...................................................................................................17

II.    There Is No Credible Allegation of Particularized and Irreparable Harm to NVCA. ..............................................................................................17

A.   NVCA's Alleged Irreparable Harm Is a Result of its Own Egregious Delays and Failure to Pursue its Administrative Review Opportunity. ..............18

B.   NVCA Makes No Showing of Particularized and Redressable Environmental Harm That Is Immediate and Irreparable...............................................19

III.   The Balance of the Equities and Public Interest Favors VDOT and the Defendants. ............................................................................................22

IV.   Shuld This Court Grant Preliminary Relief, The Injunction Must Be Narrow and Bonded...............................................................................................24

CONCLUSION ......................................................................................................24

CERTIFICATE OF SERVICE ...............................................................................26

i

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987)..................................................................................... 22
*Bicycle Trails Council of Marin v. Babbit*,
    82 F.3d 1445 (9th Cir. 1996) ...................................................................... 20
*Coastal Conservation League v. United States Army Corps of Eng'rs*,
    2016 U.S. Dist. LEXIS 160167, *73 (D.S.C. Nov. 18, 2016) ................................. 24
*Hughes River Watershed Conservancy v. Glickman*,
    81 F.3d 437 (4th Cir. 1996) ........................................................................ 13
*Majorica, S.A. v. R.H. Macy & Co.*,
    762 F.2d 7 (2d Cir. 1985)............................................................................ 19
*McGean v. Montgomery County*,
    87 F.3d 1309 (4th Cir. 1996) ...................................................................... 21
*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)................................................................................... 17
*National Audubon Society v. Department of Navy*,
    422 F.3d 174 (4th Cir. 2005) ................................................................ 13, 21
*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ...................................................................... 17
*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ...................................................................... 13
*Potomac Heritage Trail Ass'n v. U.S. Department of Transportation*,
    2022 U.S. Dist. LEXIS 186457, *51 (U.S.D.C. Md 2022)..................................... 22
*Price Road Neighborhood Ass'n v. U.S. Dept. of Transportation*,
    113 F.3d 1505 (9th Cir. 1997) .................................................................... 17
*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ........................................................................ 19
*Rio Associates, L.P. v. Layne*,
    2015 U.S. Dist. LEXIS 73957 at *6 (W.D. Va.  2015)....................................... 24
*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)................................................................................... 13
*The Real Truth About Obama, Inc. v. FEC*,
    575 F.3d (4th Cir. 2009) ............................................................................ 12
*The Real Truth About Obama, Inc. v. FEC*,
    559 U.S. 1089 (2010), 607 F.3d 355 (4th Cir. 2010)........................................ 12
*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................. 12, 22

**Statutes**

5 U.S.C. § 706(2)(A).................................................................................................. 13

23 U.S.C. §139(I)(1) .................................................................................................. 14

42 U.S.C. § 4332 ........................................................................................................ 13

**Rules**

Fed. R. Civ. P. 65(c) .................................................................................................. 24

**Regulations**

40 CFR § 1502.9 ......................................................................................................... 15

40 CFR § 1502.9(d)(1)(ii)........................................................................................... 15

## COMMONWEALTH DEFENDANTS' OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Virginia Department of Transportation (the "Department") and Secretary W. Sheppard Miller, III, in his individual capacity, (together the "Commonwealth Defendants"), by counsel, respectfully submit this memorandum in opposition to the Motion for Preliminary Injunction of plaintiff Northern Virginia Citizens Association, Inc. ("NVCA" or "Plaintiff") [ECF 13]. Plaintiff has made no showing of irreparable harm, nor can it demonstrate a likelihood of success on the merits. To the contrary, Plaintiff's lack of diligence in seeking relief – after the limitations period for challenging the environmental process, after construction plans were finalized, after construction has started, after trees have been cleared, and more than four years after the planning for the challenged work publicly was announced – eliminates any claim of irreparability or time-sensitivity.

Plaintiff also cannot demonstrate a likelihood of success on the merits because all of the matters of which they complain were reviewed as part of the Project's environmental assessment, there is no statutory basis for conducting additional review, relief is time-barred, and the balance of equities and public interest far outweighs NVCA's perceived harms.

## FACTS

In addition to the facts set forth below, the Commonwealth Defendants adopt and incorporate by reference the Statement of Facts and Declarations set forth in the Memoranda in Opposition of defendants Capital Beltway Express, LLC ("CBE") and the Federal Highway Administration ("FHWA").

### The Project

1.      The 495 Express Lanes Northern Extension ("495 NEXT" or "Project") will bring

1

nearly 3 additional miles of improvements to Interstate 495 between the Dulles Toll Road and just north of the George Washington Memorial Parkway (GWMP) interchange.  Two additional High Occupancy Toll ("HOT") lanes will be added to extend access for high-occupancy vehicles and toll travelers.  The Project replaces four bridges, widens and repairs two bridges, builds ramps and bridges, creates new bike and pedestrian paths, and adds new and rebuilt noise walls.  *Declaration of Susan Shaw,* Ex. 1 at ¶ 4.

2.     The Project has broad public support.   It has received letters, resolutions, or other indications of support from the Fairfax County Board of Supervisors, the McLean Citizens Association, Northern Virginia Transportation Alliance, Dulles Area Transportation Association, Virginia Transit Association, and nine Chambers of Commerce, including Greater McLean Chamber of Commerce, Tysons Regional Chamber of Commerce, and the Northern Virginia Chamber of Commerce.  *Declaration of Michelle Holland,* Ex. 2 at ¶ 4.

3.     The independent utility, purpose and need for 495 NEXT were recognized and approved by FHWA, which concluded:

[T]he project would result in an overall increase in person throughput resulting from additional capacity.  In addition, by increasing the person-carrying capacity of I-495 and by providing a reliable travel option using express lanes, drivers would have less incentive to use local cut-through routes. Traffic models with the project in place forecast a reduction in traffic volume and travel delay on the local street network, most notably along Georgetown Pike. Traffic volume demands and corresponding delays on Georgetown Pike are projected to decrease at five intersections along the corridor, including at: (1) Swinks Mill Road, (2) southbound I-495 ramps, (3) northbound I-495 ramps, (4) Balls Hill Road, and (5) Dead Run Drive.

The project has independent utility because it would provide a usable facility and is a reasonable expenditure of funds even if no additional improvements in the area are made, including from the I-495 & I-270 Managed Lanes Study in Maryland.

*Declaration* of *Scott Smizik*, Ex. 3, Attachment C at 18-19.

4.      Because it is independent and serves distinct purposes and needs, 495 NEXT is independent of potentially interconnecting highway improvements by the State of Maryland, including Maryland's planned widening of the American Legion Bridge, as approved by the region with the Maryland project's inclusion in the Constrained Long Range Plan (CLRP) and by the FHWA in its Record of Decision in August 2022.

***The Environmental Assessment Was Comprehensive and Considered the Types of Harm Now Alleged By NVCA***

5.      VDOT, in coordination with FHWA as the lead federal agency, began environmental review for the Project in 2018.  On April 18, 2018, FHWA issued its concurrence with VDOT's determination that an Environmental Assessment under the National Environmental Policy Act ("NEPA") was the appropriate level of review.  Ex. 3 at ¶ 4.

6.      The Project environmental assessment was made available to the public in February 2020 and remained open for public comment until December 2020.  VDOT then prepared a revised environmental assessment in response to public comment.  Ex 3 at ¶ 9.

7.      An environmental assessment does not evaluate a specific build configuration, but instead reviews the environmental impacts from an overall project goal that is intended to fulfill the described purpose and need.  Ex. 3 at ¶ 6.

8.      The purpose of the environmental assessment for the 495 Project was to review an extension of I-495 HOT Lanes for three miles, including ramp improvements and lane reconfigurations, to reduce congestion, provide additional travel choices, and improve travel

3

reliability. Ex. 3, Attachment A; May 21, 2021 Revised Environmental Assessment ("EA") at 1-1, 1-11 to 1-22.

9.      The Build Alternative considered in the EA was to extend the existing HOT Lanes, add general purpose auxiliary lanes, add access to the Express Lanes network, improve the interchanges at the GWMP and Dulles Toll Road, and reconstruct overpasses.  EA at 1-1 to 1-5, 2-2 to 2-6.

10.     The EA assessed potential environmental impacts of the Build Alternative within a defined boundary of planned impact, known as the Limits of Disturbance ("LOD")  EA at 3-1-3.3. The impacts evaluated were "the worst-case scenario and assume complete direct impact to the resource occurring with the LOD [Limits of Disturbance]]."   EA at 3-1 to 3-2; Ex. 3 at ¶ 6.

11.     The GWMP interchange as well as all areas of Live Oak Drive at issue in NVCA's Complaint and Motion for Preliminary Injunction are within the study areas of the EA and falls within the Limits of Disturbance studied by the EA.  EA at 2-3, 2-5, 3-1, 3-3, 3-19; Ex. 3 at ¶ 7.

12.     The EA, which addressed substantive public comment received during the process, was completed in May 2021 (and submitted to FHWA and the National Park Service for review. Ex. 3 at ¶ 10.

13.     On June 2, 2021, the National Park Service issued its a Finding of No Significant Impact ("NPS FONSI") for the Project.  Ex. 3, Attachment B.

14.     On June 29, 2021, the FHWA issued a Finding of No Significant Impact ("FONSI") for the Project.  Ex 3, Attachment C.  The FONSI reaffirmed that an Environmental Impact Statement was not required and that the FHWA had determined that the Project would have "no significant impact on the human environment."  Ex 3, Attachment C at 1.

15.     The FHWA published a Limitation on Claims for the FONSI in the Federal Register

on October 4. 2021.  86 Fed. Reg. 54785 (Oct. 4, 2021).  The notice advised that claims seeking judicial review of the FONSI and all related documents of the FHWA would be barred unless filed within 150 days after the notice publication date.  *Id.*

16.     NEPA review and issuance of a FONSI is not based on final construction plans. Project design is refined and matured from the conceptual description in the EA to more detailed design based on engineering and traffic analysis.  This work to refine the Project design into a final set of construction plans only can occur after the NEPA decision is issued.  Ex. 3 at ¶ 12; Ex. 1 at ¶ 12.

17.     FHWA and VDOT's practice is to pause to review projects at periodic points in their progression to ensure that all proposed activity remains within the scope of the NEPA decision.  VDOT has been using that process for 495 NEXT.  This process is documented in a series of "EQ" forms maintained by VDOT.  *Declaration of John Muse*, Ex. 4 at ¶ 5.

18.     In August 2022, John Muse, VDOT Environmental Manager, reviewed the proposed areas of utility easements and other rights-of-way to be acquired as part of the Project. This review confirmed that the right-of-way to be purchased was consistent with the footprint studied in the EA and the FONSI.  Ex. 4, Attachment A (EQ201), at 1,2.  The FHWA reviewed this determination.  *Id.* at 3.

19.     In October 2022, John Muse conducted a review of the proposed final plans and specifications for the Project and determined they were consistent with the FONSI.  The result of that review was a conclusion that the "overall project design, right of way limits and scope are within the study area evaluated in the approved approved [sic] environmental document" and "the FONSI decision continues to remain valid."  Ex. 4, Attachment B (EQ200), at 2. The FHWA reviewed this determination.  *Id.* at 3.

***All Ramps at the GWMP Interchange Are Within the EA's Assessment and Will Serve Traffic in the 495 Corridor; There are No "Proverbial Bridges to Nowhere"***

20.     The existing George Washington Memorial Parkway ("GWMP") interchange currently has two ramps on the west side of I-495 that provide access today to and from the GWMP to I-495 North and I-495 South: Ramp 1 (GWMP West to 495 South, which includes a two-lane collector-distributor ramp) and Ramp 5 (495 South to GWMP East) Ex. 1 at ¶ 13.

21.     The EA included within the reviewed Limits of Disturbance the improvements required in the GWMP interchange, including additional ramps to provide access to and from the GWMP to the extended  I-495 North and South HOT Lanes.  The preliminary conceptual design in the EA was a configuration with four at grade ramps and one ramp bridge.  EA at 2-22.  The EA noted that alternative configurations and access locations were being evaluated.  *Id.*

22.     The GWMP interchange was refined as the Project design progressed. For instance, a May 2019 public meeting depicted five potential options for the configuration of the GWMP interchange.  Ex 2, Attachment B.

23.     As of September 2021, the configuration for the GWMP interchange evolved to its current configuration.  In this configuration, the two existing ramps within the interchange area will be rebuilt (Ramp 1 from GWMP West to I-495 South, along with the two-lane collector-distributor ramp, and Ramp 5 from I-495 South to GWMP East).  A new ramp from GWMP West to I-495 South Hot Lanes (Ramp 2) will be nested within the existing interchange area. A new ramp from 495 North HOT Lanes to GWMP East (Ramp 3), once planned for the east side of the interchange, will be constructed on the west side to be nested with the other ramps within the interchange area. Ex. 1 at ¶ 14.  These refinements were depicted in a September 29, 2021 public meeting presentation.  Ex. 2, Attachment C at 12.

24.     The revised configuration of the GWMP interchange lessened the overall impacts

of the Project by eliminating conflicts with large utility transmission towers and reducing the need for right-of-way acquisition.  In particular, the movement of Ramp 5 mitigated and reduced impacts on the properties of Andrew Churchill, Alice Zhou, and Harry Yang. Ex. 1 at ¶ 15(n); *Id* Attachment A at ¶ 14.

25.     VDOT reviewed the revised configuration of the GWMP interchange, including the location of Ramp 3, with the FHWA in September 2021 to confirm that the FHWA concurred that the configuration remained consistent with the impacts addressed in the FHWA's FONSI.  Johns Simkins, on behalf of FWHA, concurred that "the minor changes to the ramps are within the LOD that was evaluated in the EA and FONSI, so from a NEPA standpoint, the changes are not an issue since everything within the LOD is already assumed to be impacted." Ex. 3 at ¶ 13; *Id* Attachment F at 1.

26.     The configuration of the GWMP interchange ramps was analyzed in the Project's Interchange Justification Report Addendum, which was approved by FHWA on January 14, 2022. Ex. 1 at ¶ 16.

27.     Each of the GWMP interchange ramps will be used by vehicle traffic at service commencement of the Project because the ramps are needed to provide access to the HOT Lanes and general purpose lanes as well as the GWMP.  Ex. 1 at ¶ 17.  All of the ramps are within the Limits of Disturbance assessed for the FONSI and VDOT's right-of-way.  Ex. 3 at ¶ 13.

28.     All of the ramps are being constructed by CBE as part of 495 NEXT. Ex. 1 at ¶ 18.

***Stormwater Management Was Included in the EA***

29.     The conceptual design for stormwater management included in the EA anticipated multiple stormwater management facilities throughout the Limits of Disturbance.  Part of the concept included direct drainage to the Potomac River through a 72" pipe.  Ex. 1 at ¶ 21.

30.     Stormwater requirements are established by the Virginia Stormwater Management Act.  Construction activity also requires issuance of a Virginia Pollutant Discharge Elimination System (VPDES) permit.  A VPDES has been issued for the work of the Project.  Ex. 1 at ¶ 20.

31.     Following FONSI, the stormwater management design is refined as well to incorporate the needs of construction as well as provide best management practices for mitigation of runoff and other impacts.  Ex. 1 at ¶ 19.

32.     The final design for the Project improved stormwater management in several ways, including:  elimination of the 72" pipe to the Potomac River, increasing nutrient removal; reducing the number of stormwater management facilities to three; reducing permanent and temporary right of way needs; and eliminating work immediately adjacent to the Potomac River. Ex. 1 at ¶ 21.

33.     The final design includes a stormwater management pond (SMP) within the GWMP interchange.   This SMP has a treatment volume of 78,000 CF. The entirety of the SMP is within the Limits of Disturbance of the EA.  Ex. 1 at ¶ 22.

***Live Oak Drive Has Been Planned for Partial Realignment Since 2019***

34.     Project NEXT includes realignment of approximately 1200' of the southern terminus of Live Oak Drive in front of the Langley Swim Club and three properties at 728, 720, and 712 Live Oak Drive.  Ex. 2, Attachment D at 8, 9; Ex. 1 at ¶ 23.

35.     The planned realignment of Live Oak Drive was shared publicly beginning in 2019. For example, the location for Live Oak Drive was shared in the following events:

  a.  Public Information Meeting Design Boards from a public meeting on May 20, 2019.  Ex. 2, Attachment E at 17, 20.

8

  b. Public Hearing Design Boards from public hearings on October 5 and 8, 2020, Ex. 2, Attachment F at 5, 10.

  c. Preliminary Concept Maps for Live Oak Drive dated March 31, 2022.  Ex. 2, Attachment G at 1, 4, 5, 6 and 7.

36. Early alignments for Live Oak Drive moved it to the west, toward Langley Swim Club.  At the design was refined, Live Oak Drive was pulled back east toward I-495 and away from the Langley Swim Club.  The final alignment is depicted in a May 26, 2022 presentation prepared for a public meeting with Live Oak Drive residents.   Ex. 2, Attachment D at  8, 9.

37. Live Oak Drive is a 24' wide paved local road.  The 1200' of Live Oak Drive to be realigned will be 22' wide with curb, gutter and shoulders varying from 2' – 7' wide.  Ex, 1 at ¶ 24.

38. Regular Project Updates also have informed community residents of upcoming construction activities, including the realignment of Live Oak Drive, since May 2022.

  a. The May 26, 2022 meeting for Live Oak Drive residents stated that Live Oak Drive construction would begin "Summer 2022" and be complete in "2024."  It also advises that trees on both sides of Live Oak Drive would be impacted.  Ex 2, Attachment D at 11, 12.

  b. An October 31, 2022, Notice to Live Oak Residents informed them that "crews will begin clearing trees." and that "once clearing activities and utility relocations are complete, crews will begin constructing the new, realigned Live Oak Drive, which will be shifted slightly west."  Ex. 2, Attachment H.

  c. On January 30, 2023, Live Oak Drive residents received a notice advising of several construction activities in preparation for the realignment of Live Oak Drive,

including "Temporary pavement will be placed;" "Traffic will be shifted temporarily onto the new [temporary] alignment on this Section of Live Oak Drive;" and "Crews will begin constructing the new, permanent alignment of Live Oak Drive." Ex. 2, Attachment I.

39.    Tree clearing within the VDOT right-of-way in the GWMP interchange and the vicinity of Live Oak Drive began in January 2023 and was completed in March 2023.  Ex. 1 at ¶ 25.

40.    The only remaining tree clearing to be done where Live Oak Drive is being realigned is on private properties pursuant to either an agreement reached with the property owner for the purchase of their land or a certificate of take for which the landowners will be compensated as required by law.  This remaining tree clearing is to facilitate the relocation of existing utilities of Dominion, Verizon and Cox, which consist of including telephone poles, wires and underground conduit.  Ex. 1 at ¶ 26.

***VDOT Has Regularly and Timely Provided Project Information to the Public, Including NVCA***

41.    VDOT has undertaken an extensive effort to proactively, regularly and transparently update local communities and the public about the Project throughout its planning, procurement, design and construction stages.  Ex. 2 at ¶ 6.

42.    VDOT maintains an extensive Project website that is updated regularly at www.495northernextension.org.  VDOT has hosted 10 public information meetings and hearings since October 5, 2020.  It has held 45 meetings with homeowner's associations and similar groups, including four meetings with Live Oak Drive area residents on November 29, 2021, December 6, 2021, May 26, 2022, and December 16, 2022.  Ex. 2 at ¶ 15.

***The Costs of Delay to the Commonwealth and Public Would Be Substantial***

43.     The Project will bring more travel choice to the Beltway, reduce congestion, and improve safety.  Any delay to the Project increases the amount of time that these improvements will not benefit the traveling public.  Ex. 1 at ¶ 29.

44.     The Project will move up to 2,500 more people per hour in both directions on Interstate 495.  The Project also will bring increased travel choices in the corridor.  Travelers who choose to use the express lanes by carpooling, using the planned new regional bus service, or by paying a toll, will experience travel time savings in both directions, and overall better connectivity to the regional express lanes network and local roads.  Ex. 1 at ¶ 5.

45.     The Project also will improve travel on local roads.  Improvements on 495 will mean fewer drivers relying on local neighborhood routes, leading to a reduction in traffic volumes and a reduction in traffic delays. For example, the busy Georgetown Pike intersections will experience a nine percent reduction in traffic volume, and up to a 40 percent decrease in delays. Ex. 1 at ¶ 6.

46.     495 NEXT will improve safety throughout the corridor by adding and improving acceleration and deceleration lanes on the general purpose lanes.  Ex. 1 at ¶ 7.

47.     The Project also brings new bike and pedestrian trails to the area.  Ex. 1 at ¶ 8.

48.     495 NEXT includes support for new transit, including new bus service across the American Legion Bridge, which is planned to begin in 2024.  Ex. 1 at ¶ 9.

49.     The Project includes a commitment to environmental mitigation and improvement. New stormwater facilities will improve and update stormwater management.   The Project also includes a stream restoration project that is planned to start after the Project is complete.  Ex. 1 at ¶11.

50.     CBE also has committed to making Transit and Corridor Investment payments

upon service commencement of the Project.  Fairfax Count already is purchasing buses so this service may start in 2024.  A delay to the Project would delay these payments from CBE, requiring the public to identify additional funds of approximately $200,000 per month in year 1 and $210,000 per month in year 2 to maintain this planned service.  Ex. 1 at ¶ 30.

51.     VDOT's Project management and oversight costs are $1.2 million per month based on the average monthly cost since July 1, 2022.  A one-year project delay would result in an additional $16.4 million in management and oversight costs with an additional $17.2 million in costs for a second year of delay.   Ex. 1 at ¶ 28.

52.     If the Project is enjoined, the current work would need to be suspended in its current condition, with accommodations as needed to ensure the safety of the traveling public. This would require the lane closures, concrete barriers, temporary environmental controls, to remain in place with all the traffic congestion and disruption those active work zone features create. The duration of construction impacts would be extended, such as noise, traffic delays, and lack of full shoulders.  Ex. 1 at ¶ 29.

## STANDARD OF REVIEW

The Supreme Court of the United States has set a high bar for a preliminary injunction.  A movant must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.  *Winter v Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The movant must carry the burden of persuasion on each of these elements with a "clear showing" to achieve the extraordinary remedy of preliminary injunctive relief.   *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds,* 559 U.S. 1089 (2010), *reissued in part* 607 F.3d 355 (4th Cir. 2010).

The decisions of the Federal Highway Administration challenged by NVCA only may be

set aside if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where decisions regarding environmental impacts are at issue, the Court is not to "second-guess agency decisions, so long as the agency has given a hard look at the environmental aspects of its proposed action." 42 U.S.C. § 4332; *National Audubon Society v. Department of Navy,* 422 F.3d 174, 184 (4th Cir 2005). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co*., 556 F.3d 177, 192 (4th Cir. 2009).

NEPA establishes procedural requirements that must be followed before certain federal actions are taken to ensure that environmental consequences of those actions are considered by public officials. 40 CFR §1500.1(c). NEPA does not mandate certain outcomes, nor does it constrain agency decision making. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). NEPA only prohibits "uniformed" agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989).

## ARGUMENT

### I. NVCA Has Not Shown a Likelihood of Success on the Merits.

#### A. All Impacts of Which NVCA Complains Were Considered in the Revised Environmental Assessment.

NVCA contends that VDOT did not consider the final configuration of the GWMP interchange, the stormwater management basin within the interchange, or the alignment of Live Oak Drive as part of the EA. This is incorrect. All of these elements, as well as their potential environmental impacts, were part of the EA.

Each of the features identified by NVCA are being constructed within the Limits of Disturbance of the EA. While the study area was actually larger than the Limits of Disturbance, the Limits of Disturbance is the area found to accommodate "roadway improvement, drainage,

stormwater management facilities, utilities, erosion and sediment control, noise control measures, construction methods, and temporary construction easement." EA at 3-1. The EA assumed that all areas within the Limits of Disturbance would be impacted in the "worst case scenario." Id. The EA also assumed "complete direct impact to the resource" within the Limits of Disturbance. Id. In this manner, the EA was based on any or all of the Limits of Disturbance actually being disturbed, disrupted, destroyed, or otherwise dedicated to an aspect of the Project.

The EA specifically reviewed air quality, noise pollution, and impacts on local populations, including school children and children's health, as part of the assessment. See, e.g., EA at 3-16 to 3-33, 3-53 to 3-65 to 3-76. These assessments were supported by a Revised Air Quality Technical Report and a Preliminary Noise Technical Report. EA at 3-53, 3-61. The EA also considered the need for – and impact of – stormwater management facilities within the Limits of Disturbance to address stormwater runoff from impervious surface. See, e.g., EA at 3-73, 3-80, 3-85, 3-91 to 3-95. It further provided that the Project "was required to comply with the administration, implementation, and enforcement of the Virginia Stormwater Management Act." EA at 3-73.

The Project elements and the alleged environmental effects cited by NVCA in its Complaint and Memorandum in Support of Preliminary Injunction are matters that were reviewed, assessed, and considered in the EA and FONSI. As a result, they are not "major significant changes" or "new information" or "additional activities" for purposes of NEPA as claimed by NVCA. To the contrary, the construction and its potential impacts were considered and any challenge to the conclusions of the EA and the FHWA's issuance of the FONSI became barred after March 3, 2022. 23 U.S.C. §139(I)(1); 86 Fed. Reg. 54785 (Oct. 4, 2021) (claims seeking judicial review of the FONSI and NPS FONSI barred after March 3, 2022). As a result, NVCA's claims about Project harms and the process utilized by VDOT and the FHWA are no longer

14

justiciable.

**B.  The Re-evaluation Process of 40 CFR § 1502.9(d)(1)(ii) Does Not Apply.**

NVCA argues that the FHWA is required to undertake a supplemental environmental impact statement for the Project because it believes the configuration of the GWMP interchange area, including the SMP and realignment of a portion of Live Oak Drive, present "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its merits" such that review under 40 CFR § 1502.9(d)(1)(ii) was triggered.  This regulation does not apply.

40 CFR § 1502.9 applies to projects for which an Environmental Impact Statement (EIS) has been required and utilized.  As determined by the FHWA's Concurrence, an EIS was not required for 495 NEXT.  Because the Project is not proceeding under an EIS, the regulation by its plain language does not apply.  The cases relied upon by NVCA to support its demand for review also are inapplicable, as they each address Projects for which an EIS was issued.   The entirety of NVCA's Complaint is based on the faulty premise that further review under 40 CFR § 1502.9 is required, but that regulation has not been triggered.

**C.  VDOT and the FHWA Exceeded the Review Requirements of NEPA.**

Notwithstanding that the impacts of which NVCA complains were reviewed and addressed in the EA, the construction plans and planned right-of-way acquisitions were reviewed by VDOT and shared with the FHWA prior to the start of construction to ensure the works' consistency with the EA and the FONSI.   VDOT also specifically called out the configuration of the GWMP interchange area in a meeting with FHWA to confirm that the design was within the scope of the FONSI and that all environmental impacts from the configuration had been assessed as part of the EA.

In September 2021, VDOT reviewed the GWMP interchange design, including the shifted location of Ramp 3, with the FHWA.  The FHWA concluded that nothing about the configuration merited further consideration.  The FHWA specifically found that "the minor changes to the ramps are within the [Limits of Disturbance] that was evaluated in the EA and FONSI, so from a NEPA standpoint, the changes are not an issue since everything within the LOD is already assumed to be impacted."  Ex. 3, Attachment F.

VDOT also undertook a review and validation of Project plans and specifications in October 2022 prior to the start of construction activities to validate the plans remained within the FONSI.  As part of this review, VDOT assessed all work in the GWMP interchange area, including the work on the alignment of Live Oak Drive, the ramp locations, and final SMP placement.  The purpose of this analysis was to confirm the final plans for construction match the footprint originally studied in the EA and the FONSI remains valid.  Ex. 4 at ¶ 4.  As documented on VDOT's EQ-200 form shared with FHWA, the review confirmed that there had been "no changes to environmental impacts or mitigation identified in the approved environmental document [FONSI]" and "the FONSI decision continues to remain valid."  Ex. 4, Attachment B.

VDOT also reviewed the approved right-of-way acquisition plans as consistent with the right-of-way acquisitions assessed in the EA.  Ex. 4 at ¶ 5.  This review was documented in VDOT's EQ-201 form, also shared with the FHWA.  The review concluded that the right-of-way acquisitions planned for the Project were generally consistent with the EA such that the FONSI remained valid.  Ex. 4 at ¶ 5, Attachment A.  This process included review of the three properties subject to utility easement acquisitions along Live Oak Drive.  *See* Ex. 4, Attachment A at 4 (identifying Parcels 081, 082, and 089).

NVCA's allegations that the FHWA and VDOT failed to consider the design and

configuration for aspects of the Project, including the GWMP Interchange and its SMP, are without merit.  FHWA and VDOT have complied with the requirements of NEPA through thorough evaluative reviews undertaken by VDOT and provided to FHWA.  *See, e.g., Price Road Neighborhood Ass'n v. U.S. Dept. of Transportation,* 113 F.3d 1505, 1510 (9th Cir. 1997) (review concluding no discernable impact from refinements satisfies NEPA process).  The FHWA and VDOT reviews and conclusions are entitled to deference by this Court.  *Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009).   As a result, there is nothing in the record to even suggest that the agency conclusions were arbitrary, capricious or an abuse of discretion to support action under NEPA or the Administrative Process Act.   The determinations were rooted in the EA and made in a considered manner and do not support any relief to NVCA.

### D. Plaintiff Cannot Prevail Because It Does Not Have Standing to Bring this Action.

Plaintiff also cannot prevail on the merits because they lack standing to bring this action. Plaintiff must satisfy two types of  standing to proceed:  Article III standing and prudential, or "zone of interest," standing.  NVCA fails both of these standing requirements NVCA's allegations are no more than bare bone recitations of generalized harm and interest that do not satisfy the standing requirements.    The Commonwealth Defendants incorporate and adopt herein the arguments of CBE and the FHWA as set forth in their Opposition Memoranda with regard to NVCA's lack of standing.

### II. <u>There Is No Credible Allegation of Particularized and Irreparable Harm to NVCA.</u>

Because NVCA cannot show a likelihood of success on the merits, no further review is needed.  *See Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 156-57 (2010).  Nonetheless, NVCA also has made no showing of credible irreparable harm sufficient to support preliminary injunctive relief.

**A. NVCA's Alleged Irreparable Harm Is a Result of its Own Egregious Delays and Failure to Pursue its Administrative Review Opportunity.**

VDOT has been transparent and proactive in informing the community about the Project, including the configuration of the GWMP interchange features and Live Oak Drive.  Plaintiff's Complaint and the Declarations filed in support of NVCA's requested relief show that NVCA and its members have known about the Project, in some case, for years.  They have known about the construction activities for months.  Despite VDOT's efforts to share information regarding the Project and NVCA's own admitted knowledge of Project events, NVCA waited until March 16, 2023, to file a lawsuit and March 31, 2023 to seek preliminary injunctive relief.  NVCA's belated plea for this Court's intervention comes after expiration of the limitations period for the FONSI, after many public meetings, after release of the plans and information about the current configuration, a year after the Project broke ground – and months after the start of tree clearing and site grading activities for the GWMP interchange and Live Oak Drive realignment.

NVCA had more than four years to bring forward its concerns about the Project and the environmental assessment process.  They had 150 days to challenge the FONSI and did not. NVCA's members have known of the planned ramp configuration at the GWMP interchange since at least September 2021.  They have known about the realignment of Live Oak Drive since at least May 2022.  They were informed in October 2022 that tree clearing would begin in November 2022.   NVCA watched construction plans be finalized, trees be cleared, land be graded, noise walls be demolished, and other construction activities begin, and still took no action.  NVCA's delay in filing suit undermines any argument it now makes about urgency of action and irreparable harm to them.

Two of the Declarants purchased the houses in which they now live and claim to be

impacted *after* the Project plans and environmental assessment were underway. ECF 1-4 (Jasak); 1-5 (Ravi).  These individuals cannot have irreparable harm when they deliberately moved next to I-495 after the Project was in progress.

NVCA had all of the facts needed to pursue its relief months – if not years – ago. NVCA's distress over tree clearing, road realignment and its other non-particularized claims could have been redressed months ago.  The driving force behind a request for a preliminary injunction is that time is of the essence and the status quo must be maintained until the court may review the merits of the issues presented.  NVCA has shown little interest in having the merits of its allegations adjudicated.  Rather, it appears to be seeking to use preliminary injunctive relief as a bludgeon to shut down a project that has extensive public benefits and is widely supported by the larger community at the final hour for their own private gain.

When a plaintiff delays in seeking such relief by the court, it indicates the lack of the type of irreparable harm requiring a preliminary injunction.  *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (noting that even if a delay does not rise to the level of a defense under laches, it still may be grounds for denial of a preliminary injunction). A lack of diligence in pursuing a preliminary injunction can be enough, by itself, to prevent the granting of such relief.  *See id.*  (citing *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985)).

### B.  NVCA Makes No Showing of Particularized and Redressable Environmental Harm That Is Immediate and Irreparable.

NVCA's Motion also fails to include any actual and imminent environmental harm specific to NVCA or its members.  Most of NVCA's alleged harms are recitations of subjective harms perceived by Declarants Zhou, Churchill and Patel.  NEPA does not require VDOT or the FHWA to consider an individual's "subjective experiences."  *Bicycle Trails Council of Marin v. Babbit,*

82 F.3d 1445, 1466-67 (9th Cir. 1996), as amended, (June 17, 1996).  Such perceived harms are not redressable under NEPA, because NEPA only requires consideration of environmental impacts on the "physical world."  *Id.*

NVCA asserts that the "addition of lanes, ramps and flyovers that were not included in the original Project" will "bring more cars and trucks closer to the community."  ECF 14 at 17. NVCA's assertion that "lanes, ramps and flyover" for the Project were not part of the EA and FONSI is incorrect, as discussed *supra.*  NVCA's recitation of generalized environmental harms, such as tree loss, elimination of greenscaping along Live Oak Drive, noise pollution, light pollution, air pollution, and stormwater water run-off are insufficient to support preliminary injunctive relief.  These impacts were considered by the EA and FONSI.  Moreover, all of these claimed harms spring from the vehicles traveling within the I-495 corridor:  a corridor that has existed for decades and the character of which will not change as a result of the Project.

NVCA cites concerns about subjective, speculative threats with no justification.  For instance, it worries about the "possibility" of mosquitos from the SMP.  It also raises the specter of decreased pedestrian safety along Live Oak Drive.  These speculative concerns, with no objective support or demonstrated impacts, are not redressable.  Live Oak Drive as it exists now has no sidewalks.  The realignment of 1200' of Live Oak Drive does not remove any sidewalks or alter pedestrian habits.  While a portion of the realigned section will be 2' narrower than portions are now, the road still will meet all minimum requirements for local roadways.  NVCA points to no credible information demonstrating an irreparable change in safety along Live Oak Drive or the probability of actual effects on safety as a result of the alignment.

NVCA also states that moving 1200' of Live Oak Drive would be an "unlawful expansion into and destruction of their neighborhood if the construction activities are not enjoined. . . ."  ECF

20

14 at 25.  This statement is rife with inaccuracy.  The 1200' of Live Oak Drive being realigned is at the entry of the neighborhood and approximately half of it fronts the Langley Swim Club.  The realignment abuts only the property of the Langley Swim Club and three other properties.  All of the realigned area remains within VDOT's existing right-of-way.  Ex. 2, Attachment D; Ex. 1 at ¶14.  The realignment of a roadway within existing Commonwealth right-of-way established for road purposes cannot qualify as irreparable harm.

NVCA members in their declarations also cite concerns about diminished property values. *See* ECF 1-2 at 2; 1-3 at 2; 1-4 at 10; 14-1 at 2; 14-2 at 1.  Where the loss involves allegations of physical taking or diminishment of property, remedies for compensation are available under Virginia law.  Economic losses do not constitute irreparable harm as they are, fundamentally, compensable.  *See, e.g., McGean v. Montgomery County,* 87 F.3d 1309, (4th Cir. 1996).

NVCA's arguments also imply that NVCA has some right or entitlement to have trees as screening for their properties and to be free of the known effects of motor vehicle travel while in their homes adjacent to a highway corridor.  NVCA presumes that additional procedural review under NEPA would require the Project to abandon certain elements, eliminate certain features, restrict the use of VDOT's right-of-way, preserve trees, or eliminate pollutants.  These preferences of NVCA are not remedies available under NEPA.  "NEPA is a procedural statute; it does not force an agency to reach substantive, environment-friendly outcomes. Rather, NEPA simply requires that the agency take a 'hard look' at environmental impacts before taking major actions." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005).  The FHWA and VDOT complied with NEPA.  Even assuming *arguendo* that NVCA could show some type of procedural violation of NEPA, "procedural violations alone do not constitute irreparable harm." *Potomac Heritage Trail Ass'n v. U.S. Department of Transportation,* 2022 U.S. Dist. LEXIS 186457, *51

(U.S.D.C. Md 2022) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)).

### III.      The Balance of the Equities and Public Interest Favors VDOT and the Defendants.

The final two factors for evaluation, the balance of the equities and public interest, may be considered together when the government is the defendant.  *Potomac Heritage Trail,* 2022 U.S. Dist. LEXIS 186457, *55.   NVCA cannot show that the balance of equities tips in their favor or that the relief they demand is in the public interest.  Rather, the balance of equities favors VDOT and the public interest over the private grievances and unreasonable delay of NVCA.

NVCA's delays in filing its Complaint and bringing forward its Motion for Preliminary Injunction weigh against granting any relief to NVCA.  The need for expedited review and emergency relief is one of NVCA's own making.  The tree removal is essentially complete.  Construction of the SMP is underway.  Temporary paving for Live Oak Drive is scheduled.   To stop the overall Project now—with contractors underway, travel lanes restricted, bridges in partial stages of demolition, and substantial financial and human resources dedicated to timely completion of the work – would be extraordinarily disruptive to VDOT, to CBE and, most importantly, to the traveling public.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.   495 NEXT has wide public support throughout the region.  Ex. 2 at ¶ 4.  The public interest in seeing the Project completed without delay outweighs NVCA's interest, and the personal, private preferences of its members, as expressed in its Motion and supporting Declarations.

The Project is designed to bring relief from traffic congestion, on both I-495 and local roads.  It also adds new travel choices in the form of pedestrian and bike trails, transit and extended high occupancy vehicle and express lane options.  Ex. 1 at ¶ 4.   The Project includes new

stormwater facilities to improve and update stormwater management and a stream restoration project. Ex. 1 at ¶ 11.   Any delay to the Project due to injunctive relief will increase the amount of time that these improvements are not available to the traveling public.  Ex. 1 at ¶ 29.

If the Project is enjoined, the current work would need to be suspended in its current condition, with accommodations as needed to ensure the safety of the traveling public.  This would require the lane closures, concrete barriers, temporary environmental controls, to remain in place with all the traffic congestion and disruption those active work zone features create.   Ex. 1 at ¶ 29.  The duration of construction impacts would be extended, such as noise, traffic delays, and lack of full shoulders.   The burden of delay would fall on the public, in the form of continued work zone disruptions despite the lack of Project progress and the extended and delayed completion of the overall Project.

VDOT also has a substantial monthly carrying cost for the Project.  VDOT's Project management and oversight costs are $1.2 million per month based on the average monthly cost since July 1, 2022.  A one-year project delay would result in an additional $16.4 million in management and oversight costs with an additional $15.1 million in costs for a second year of delay.  Ex 1 at ¶¶ at 28, 30.

NVCA cannot meet its burden to show that the equities favor its position or that an injunction is in the public interest.  The public has demonstrated its support for 495 NEXT and it would be unduly burdened by the impacts of delay.   VDOT – and, by extension – the Commonwealth's citizens have made a reasonable investment in the Project in anticipation of the many benefits it will deliver to the region.  The relief of congestion, safety enhancements, and quality of life improvements to be gained through the Project require the denial of injunctive relief. *See, e.g.,  Coastal Conservation League v. United States Army Corps of Eng'rs*, 2016 U.S. Dist.

LEXIS 160167, *73 (D.S.C. Nov. 18, 2016); *Rio Associates, L.P. v. Layne*, 2015 U.S. Dist. LEXIS 73957 at *6 (W.D. Va.  2015).   The claimed, but speculative and non-redressable, alleged harms of some individuals cannot outweigh the public benefits of and needs for the Project.

**IV.**   **Should This Court Grant Preliminary Relief, The Injunction Must Be Narrow and Bonded.**

NVCA seeks to enjoin the entirety of the Project even though its allegations focus only on the GWMP interchange ramps, SMP, and the realignment of Live Oak Drive.  Should injunctive relief be granted, the injunction should be narrowly tailored to enjoin only limited construction activities within those specific areas addressed in NVCA's Motion.

Furthermore, no relief can be granted without a bond from NVCA pursuant to the requirements of Fed. R. Civ. P. 65(c).  The bond should be no less than all delay costs to be incurred by CBE on the Project as well as all carrying costs to be incurred by VDOT for at least 12 months.

## <u>CONCLUSION</u>

For the reasons stated herein as well as in the incorporated portions of the Opposition Memoranda of defendants FHWA and CBE, Plaintiff's Motion for Preliminary Injunction should be denied.

Dated: April 6, 2023                          Respectfully submitted,

                                                                /s/ Chandra D. Lantz

                                                        Jason S. Miyares
                                                        Attorney General of Virginia

                                                        Leslie A. T. Haley
                                                        Deputy Attorney General

                                                        Chandra D. Lantz (VSB No. 37245)
                                                        Senior Assistant Attorney General and Chief

Emile P. Khattar (VSB No. 95392)
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street, 5th Floor
Richmond, Virginia 23219
(804) 786-1952 (Telephone)
(804) 786-0122 (Facsimile)
clantz@oag.state.va.us

*Counsel for Defendants Virginia Department of
Transportation and W. Sheppard Miller III, in his
official capacity*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of April, 2023, I electronically filed the foregoing Notice of Appearance with the Clerk of the Court using the CMF/ECF system, which will then send a notification of such filing to counsel of record registered to use the CM/ECF system in this action, as follows:

Edwin Donald Elliott, Jr.
John Andrew Sheehan
Earth & Water Law PPLC
1455 Pennsylvania Avenue, NW
Suite 400
Washington, DC  20004
(202) 280-6263
e.donald.elliott@earthandwatergroup.com
john.sheehan@earthandwatergroup.com

John Patrick Rowley, III
SECIL Law PLLC
1701 Pennsylvania Avenue, NW
Suite 200
Washington, DC  20006
(703) 402-8800
jrowley@secillaw.com

*Counsel for Plaintiff*

N. Thomas Connally, III (VSB No. 36318)
Jon M. Talotta (VSB No. 44590)
W. James Conlin, IV (VSB No. 92169)
Kellie A. Majcher (VSB No. 96162)
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, Virginia 22102
(703) 610-6100 (Telephone)
(703) 610-6200 (Facsimile)
tom.connally@hoganlovells.com
jon.talotta@hoganlovells.com
william.conlin@hoganlovells.com
kellie.majcher@hoganlovells.com

*Counsel for Defendant Capital
Beltway Express LLC*

        */S/ Chandra D. Lantz*
Chandra D. Lantz
Senior Assistant Attorney General and Chief

26