**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| _____ | | |
| NORTHERN VIRGINIA CITIZENS ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:23-cv-00356-LMB-IDD |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**DEFENDANT CAPITAL BELTWAY EXPRESS LLC'S**
**<u>OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Dated: April 6, 2023

N. Thomas Connally, III (VSB No. 36318)
Jon M. Talotta (VSB No. 44590)
W. James Conlin, IV (VSB No. 92169)
Kellie A. Majcher (VSB No. 96162)
James T. Banks (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, Virginia 22102
(703) 610-6100 (Telephone)
(703) 610-6200 (Facsimile)
tom.connally@hoganlovells.com
jon.talotta@hoganlovells.com
william.conlin@hoganlovells.com
kellie.majcher@hoganlovells.com
james.banks@hoganlovells.com

*Counsel for Defendant Capital*
*Beltway Express LLC*

Defendant Capital Beltway Express LLC ("CBE"), by counsel, hereby opposes Plaintiff's Motion for Preliminary Injunction (ECF No. 13) and states as follows:

**INTRODUCTION**

The plaintiff association and its members have for years voiced opposition to the extension of the Capital Beltway toll lanes near their neighborhood in McLean. They have for months complained about aspects of the ongoing project, including at public forums. Now, after months of work on this $660+ million project, the Northern Virginia Citizens Association, Inc. ("NVCA") asks for emergency relief to halt construction on the entire project, claiming that "irreparable harm" will imminently occur from an alleged violation of the National Environmental Policy Act ("NEPA") relating to design refinements common to a project of this scale. NVCA's motion for a preliminary injunction fails under every criterion:

- First, there is no emergency. Construction has been ongoing since March 2022. The plans NVCA challenges have been publicly disclosed for months, if not years, and the subject of extensive public review and comment, including by NVCA. Yet NVCA chose not to file suit until March 17, 2023, and chose not to move for a preliminary injunction until March 31, 2013. This "delay undermines its claim of urgent need for [injunctive relief] to protect against imminent injury." *See Kirollos v. Microteq*, LLC, No. 2:09cv196, 2009 WL 10689357, at *5 (E.D. Va. May, 14, 2009).

- Second, NVCA lacks Article III standing to bring its claims, depriving this Court of subject matter jurisdiction. The actual or imminent harms NVCA alleges (*e.g.*, tree removal, construction dust, noise, light, loss of privacy) are not the result of alleged procedural defects in final agency action and, accordingly, are not redressable by the procedural relief NVCA has requested.

1

- Third, NVCA cannot prevail on the merits. Its NEPA claim is time barred, and its assertions of so-called "radical" design changes are in fact mere refinements of long-standing plans for which the Federal Highway Administration ("FHWA") was wholly justified in deciding that additional environmental review is not required, especially in light of previous studies, modeling and permitting by other responsible agencies that demonstrate the project as a whole will not have significant impacts on the air, water, and noise levels in the neighborhood. Further, the challenged design changes are within the "limits of disturbance" in the approved plans for the project, and thus contemplated and within the scope of those prior approvals, as confirmed by further agency consideration.

- Fourth, NVCA's alleged injuries are not irreparable—the injuries have either (i) occurred already, and cannot be redressed, (ii) are the result of temporary construction activities that would have occurred under any project design, (iii) can be redressed with monetary compensation (occurring through the VDOT Right-of-Way acquisition process), (iv) are the result of living in proximity to the Capital Beltway, or (v) are entirely speculative.

- Fifth, NVCA has not shown, and cannot show, that the balance of equities favors NVCA. NVCA points to no irreparable harm, whereas halting critical-path work on the project, particularly as the summer paving season approaches, will have cascading effects far beyond day-for-day delay, adding tens of millions of dollars to the cost of the project.

- Sixth, an injunction halting construction on a major infrastructure project aimed at improving the travel reliability of one of the most high-traffic roadways in the United States, and potentially delaying completion of that project by six months to a year, is not in the public interest. Similarly, NVCA's requested relief to enjoin the entire project is not narrowly tailored to address only the alleged harms, and thus is patently improper.

## FACTUAL AND PROCEDURAL BACKGROUND

**Transurban and Capital Beltway Express LLC**: Transurban International, Ltd. ("Transurban") is a global toll road developer and operator, which through subsidiaries operates the I-95, I-495, and I-395 Express Lanes roads (the "Express Lanes") located in Northern Virginia. (Baxter Decl., ¶ 4.) Now spanning 53 miles, the Express Lanes have operated since 2012, with significant expansions opening in 2014 and 2017, and have served to alleviate traffic congestion in the region for more than a decade. (*Id.*, ¶ 5.) The Express Lanes were developed under two public-private partnerships through concession agreements with the Virginia Department of Transportation ("VDOT")—one with 95 Express Lanes LLC covering the I-95 and I-395 express lanes and a second with Capital Beltway Express LLC ("CBE") for the I-495 express lanes. (*Id.*, ¶ 5.) CBE is now wholly owned by Transurban. (*Id.*, ¶ 2.)

**The Project**:  A critical component of CBE's and VDOT's joint efforts to streamline traffic patterns and reduce congestion on the Capital Beltway is the I-495 Express Lanes Northern Extension project ("I-495NEXT"). (*Id.*, ¶ 6.)  This project involves extending the existing I-495 Express Lanes northward approximately 2.5 miles, from the Dulles Corridor to the George Washington Memorial Parkway interchange, just south of the American Legion Bridge. (*Id.*) CBE and VDOT, through contractors, are performing some of this work—including the construction of additional on- and off-ramps and refurbishment and/or replacement of sound-dampening structures—near Live Oak Drive in McLean, Virginia. (*See* 5/26/22 Live Oak Drive Community Meeting Presentation, available at http://495next.org/documents/live_oak_dr_presentation_5.26.22_final.pdf.)  The project will remove decades-old privacy panels and place a newly designed sound wall (a significant aesthetic and functional upgrade), as well as make a modest realignment of a small section of Live Oak

3

Drive itself, all occurring within VDOT's right-of-way or existing easements. (*Id.*) The work is designed to minimize disruption to the Live Oak Drive residents, as well as through traffic. (*Id.*) It also is designed to better control stormwater runoff to a stream outfall that drains through the Live Oak community. (*Id.*) This project already has received not one, but two determinations of no significant adverse impact to the environment (*id.* at 2), and has received approval to proceed from VDOT and FHWA (*id.*); 86 Fed. Reg. 54785 (Oct. 4, 2021).

**Regulatory Approvals**: In February 2020, VDOT submitted an Environmental Assessment ("EA") pursuant to NEPA in support of the larger effort to improve traffic management on the Capital Beltway (February 2020 EA, available at https://www.495northernextension.org/documents/pim032020/i-495_next_1_environmental_assessment_final_with_appendices.pdf.), followed up by a Revised Environmental Assessment ("REA") in May 2021 (May 2021 REA, available at https://www.495northernextension.org/documents/studies/070121/i-495_next_revised_ea_-_may_2021.pdf.). The REA examines in depth the potential environmental impacts of I-495NEXT and the expected benefits of the undertaking. Among the pressing needs for the project articulated in the REA, VDOT identified: (i) "[s]ubstantial multi-hour" traffic jams, including hours-long "bottlenecks" caused by existing lane structures and "heavy demand and congestion" (Ex. 1, REA at 1-15.); (ii) traffic "disturbances" caused by "local parallel arterial" roadways being used as a cut-around by drivers hoping to avoid traffic slowdowns (*id.*); and (iii) "substantial" growth in highway users as the region's population increases over the coming decades (*id.* at 1-11.). The project will reduce traffic congestion, provide additional incentives for carpooling, and improve travel reliability.[1] (*Id.* at 1-16-18.) VDOT considered "no-build" and "build" alternatives to

---

[1] Indeed, VDOT determined that it takes the average driver nearly 30 minutes to move approximately four miles from Virginia Route 123 to the American Legion Bridge during "peak"

compare the effects of maintaining the *status quo* with the projected benefits of a completed I-495NEXT. (*Id.* at 2-1.) After thorough analysis, VDOT determined that the "no-build" alternative was far inferior to the "build" option when it came to meeting the identified purpose and need of reducing congestion, improving travel reliability, and increasing travel choice. (*Id.* at 2-1—2-8.)

Importantly, VDOT also established the project's contemplated "Limits of Disturbance" ("LOD").[2] (*Id.* at 3-1—3-3.) The "cloverleaf" that NVCA complains has been unlawfully denuded is within this LOD boundary, as is a space surrounding the cloverleaf, encompassing Live Oak Drive. (*Id.*) The REA expressly notes that it "assume[s] ***complete direct impact*** to the resource occurring in the LOD." (*Id.* at 3-1 (emphasis added).) In other words, the May 2021 REA contemplated that anything within the LOD boundary would be 100% impacted by the project's construction, including Live Oak Drive.

VDOT also set forth a thorough analysis of the potential environmental consequences of the I-495NEXT project, both positive and negative. (*Id.* at 3-1, 3-94.) Upon review of VDOT's comprehensive analysis, FHWA issued its "finding of no significant impact" ("FONSI") on the human environment.[3] (June 2021 FHWA FONSI, available at https://www.495northernextension.org/documents/studies/070121/fhwa_finding_of_no_significant_impact.pdf at 1.) The direct consequence of the FONSI is that FHWA has determined no additional environmental analysis is needed or required—and has expressly approved the notion that all aspects of the human environment within the project's LOD would be completely and

---

travel times—nearly five times longer than the off-peak travel times—with an observed high-end trip length of nearly a full hour. (*Id.*) Where Express Lanes already operate, users of the Express Lanes see no difference in travel times between peak and off-peak hours. (*Id.* at 1-21.)

[2] The LOD is typically defined as the boundary within which all construction and related activities, such as materials storage, grading, and related activities will occur.

[3] In support of the Revised EA and FONSI, CBE and VDOT have also developed appropriate stormwater and drainage management reports in connection with the project. (Ex. 2, October 2022 SWM Report, 1-15; Ex. 3, October 2022 MS-19 Report, 1-6.)

directly impacted. Similarly, the United States National Park Service ("NPS") determined that I-495NEXT would not "constitute an impairment of the resources or values" of adjacent National Parklands associated with the GW Parkway. (Ex. 4, NPS FONSI at 8.)[4]

I-495NEXT has been thoroughly scrutinized as required by NEPA and has appropriately received FHWA approval. Further still, when VDOT and CBE determined that small details concerning lane placement and the alignment of Live Oak Drive needed to be altered from the original conceptual design, VDOT promptly evaluated and discussed these refinements with FHWA. (Ex. 5, 9/2/21 VDOT to FHWA Email Chain.) FHWA determined that the refinements to the Live Oak Drive construction plan were "not an issue" and the project could proceed without renewed environmental review, because the adjustments were within the established LOD and already had been determined to completely and directly impact the environment. (*Id.*)

**VDOT Communications to Live Oak Residents**: As addressed in detail in VDOT's opposition, regular updates regarding the project have been communicated to local residents through flyers and published on the I-495NEXT project website, www.495northernextension.org. For example, in November 2021, VDOT addressed the Live Oak Drive area construction work in the "Frequently Asked Questions" tab of its public website concerning the I-495NEXT project. There, VDOT explained in detail the work to be performed and the forecasted effects of the project, including: the proposed modifications to Live Oak Drive and the surrounding area; the slope and grade changes associated with the work; the vegetation that would be removed to accommodate construction; replacement of the old privacy panels with a new sound wall; utility relocation plans for the Live Oak Drive work; stormwater drainage and management plans; and impacts to local

---

[4] (Full NPS FONSI, available at https://495northernextension.org/documents/pim092021/nps_section_106_no_adverse_effect_concurrence_04-29-20.pdf.)

parking during construction. (*See* VDOT I-495NEXT FAQ Webpage, available at http://495next.org/faq/.)

VDOT also hosted or attended public meetings on May 20, 2019, September 28 and 30, 2020, October 5 and 8, 2020, November 18, 2020, September 19, 2021, May 26, 2022, and June 6 and 7, 2022 disclosing the then-current state of planning and construction in the vicinity of Live Oak Drive. (*See* VDOT Public Meetings & Events Webpage, available at http://495northernextension.org/news_events/public_meetings_events/default.asp.) In particular, the meeting presentation materials from June 6, 2022 identify each and every project facet about which Plaintiff currently complains. (6/6/22 Live Oak Drive Community Meeting Presentation, available at http://495next.org/documents/pim06062022/495_next_june_6_and_7_meetings_presentation_final_version_6.6.22.pdf.)

More recently, on January 30, 2023, VDOT provided the residents of Live Oak Drive flyers alerting them to the impending commencement of work on Live Oak Drive. That flyer described the removal of approximately 400 feet of the old privacy panels and accompanying construction activities, including preparations for realignment of Live Oak Drive through establishment of temporary drainage facilities and pavement, temporary traffic pattern changes, additional vegetation-clearing, and relocation of utility lines. (Ex. 6, 1/30/23 Flyer.) On March 29, 2023, another flyer—updating residents on the status of the project and again describing the previously disclosed work on Live Oak Drive—was published online and distributed to the Live Oak Drive residents. (ECF No. 14-3).

**NVCA Members Speak Out Regarding the Project**: NVCA has, for many months, repeatedly and publicly stated its opposition to the project. Indeed, that is one of the stated goals

and primary objectives of NVCA. (*See* NVCA Webpage, available at https://northernvirginiacitizensassociation.org/ (sharing information about and requesting support for efforts against completion of the I-495NEXT project). For example, December 21, 2022, Debra Butler (an NVCA leader and declarant in support of NVCA's Complaint) publicly acknowledged that she knew that the long-planned construction was underway, even conceding that the alleged harms asserted in the Complaint and Motion for Preliminary Injunction had already occurred. ("McLean Residents Affected by I-495 Widening Push for Possible Legislative Action," Dec. 21, 2022. Available at https://www.ffxnow.com/2022/12/21/mclean-residents-affected-by-i-495-widening-push-for-possible-legislative-action/.[5]

**Work Already Performed**: On-the-ground construction work on I-495NEXT is handled by CBE's Design-Build contractor Lane Construction Corporation ("Lane"), which broke ground on the project in March 2022. (Jones Decl., ¶ 4.) Since that time, more than 60 acres of trees and vegetation have been cleared, portions of the existing noise walls have been removed, preliminary stormwater management facilities have been installed, and substantial structural work is underway, including the construction of the center pier for the new Live Oak Drive bridge over the Beltway. (*Id.*, ¶ 5.) During construction, much of the site is bare ground. (*Id.*) Through February 2023, more than 17.8% of the Design-Build contract has been executed, a significant portion of which is in or around the George Washington Memorial Parkway interchange near Live Oak Drive. (Baxter Decl., ¶ 8.)

**NVCA's Demands**: In early February 2023, counsel for NVCA reached out to counsel for CBE in an effort to forestall the long-planned and ongoing construction work. (ECF No. 23-1.)

---

[5] Also, NVCA filed suit against FHWA and the Maryland Department of Transportation months ago in a separate action, and in its complaint admits to knowledge of the updated design for the Live Oak Drive area. (Ex. 7, *NVCA v. FHWA, et al.*, 8:22-cv-033336-DKC (D. Md. Dec. 23, 2022), Compl., ¶ 34.)

NVCA presented a litany of demands to CBE, centered around CBE conducting extensive additional environmental studies while agreeing to suspend work on the project. In late February (and as NVCA's counsel acknowledges, by no later than March 15, 2023), counsel for CBE had made clear to NVCA's counsel that CBE was not going to halt work on the project, including the re-alignment of Live Oak Drive. (*Id.*)

**The Complaint**: On March 17, 2023, NVCA filed its Complaint in this action. (ECF No. 1.) That pleading alleged a NEPA violation and an improper delegation of authority from FHWA and VDOT to CBE. (*Id.*) The injuries NVCA complains of are: lack of privacy (Compl., ¶¶ 21, 23.); increased noise levels (Compl., ¶¶ 19, 21, 23, 24.); increased dust and dirt in the vicinity of the construction (Compl., ¶¶ 21-23.); light pollution as a result of tree clearing (Compl., ¶¶ 9, 19, 23, 24.); air pollution issues exacerbated by potentially increased traffic volumes (Compl., ¶ 9, 20, 21, 23.); potential exposure to more mosquitoes than usual (Compl., ¶ 18.); erosion and other stormwater runoff issues (Compl., ¶¶ 9, 18, 25, 73.); potential pedestrian safety issues caused by a planned re-alignment of Live Oak Drive (Compl., ¶¶ 17, 18, 76.); and a possibility of increased traffic congestion on the Beltway in the vicinity of Live Oak Drive (Compl., ¶¶ 20, 22.).[6] The Complaint also alleged that CBE's and VDOT's removal of trees from active construction zones, establishment of a consolidated stormwater detention facility, and planned re-alignment of Live Oak Drive were contrary to NEPA because those design changes did not go through an extensive re-examination of their potential environmental impacts. (Compl., ¶¶ 18, 67, 70, 81.)

**Effect of Halting Work**. The imminent work relating to the realignment of Live Oak Drive is on the critical path for the entire construction project. (Jones Decl., ¶ 6.) Utility lines need to be realigned within the right of way and the easements VDOT has acquired through the Right-of-

---

[6] All of these same alleged injuries are mentioned by NVCA in its later-filed Motion for Preliminary Injunction (ECF No. 13) and Memorandum (ECF No. 14; *See, e.g.*, ECF No. 23-3.)

Way acquisition process. (*Id.*) That work will involve the additional clearing of less than one acre of trees—comprising approximately 30 trees, several of which have already been topped or trimmed. (*Id.*) Only after the utility lines are realigned, work can commence on a major structural retaining wall necessary for the construction of the Beltway access ramps and a new sound wall benefitting the local residents. (*Id.*, ¶ 7.) Dominion Energy is scheduled to commence that utility work in the coming weeks. (*Id.*) Rescheduling that work could take many more weeks—and if that work is delayed, there are cascading delays, particularly given that the project schedule was built around weather- and temperature-driven paving calendars. (*Id.*)

If work is delayed, there will be significant costs associated with de-mobilizing and re-mobilizing the site, including at the contractor, subcontractor, and CBE levels. (Baxter Decl., ¶ 10.). Skilled craft workers will have to continue being paid during the injunction so as not to lose the workforce required to build the project, because laying craft workers off only to hire others upon re-commencement of work is not an economically viable option given the tight labor market in the region. (*Id.*) And, ultimately, delivery of the project will be delayed, with resulting loss of toll revenue required to service the project debt. (*Id.*, ¶ 11.)

Below is a chart of the estimated effect of the requested relief on the ultimate delivery date for the project and the resulting cost of the delay to the project. (*Id.*, ¶ 12, Ex. A thereto.)

| 495 NEXT Preliminary Injunction Project Shutdown Potential Impacts | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Project Shutdown Starting 4/8/2023 | Shutdown Starts | Shutdown Over | Lane/Shirley Restart Project (1 Week) | Subcontractor Remob (6 Weeks) | Service Commencement | Final Completion | Total Delay (Cal Days) | DB Costs | CBE SPV Oversight Costs | CBE Legal Outside Counsel Costs | CBE Financing / Loss of Revenue Costs | Total Estimated Delay Cost |
| 30 Day Shutdown | 08/Apr/23 | 07/May/23 | 14/May/23 | 18/Jun/23 | 28/May/26 | 24/Nov/26 | -178 | $ 59,000,000.00 | $ 2,759,000.00 | $ 500,000.00 | $ 8,777,012.66 | $ 71,036,012.66 |
| 60 Day Shutdown | 08/Apr/23 | 06/Jun/23 | 13/Jun/23 | 18/Jul/23 | 11/Sep/26 | 10/Mar/27 | -284 | $ 73,250,000.00 | $ 4,402,000.00 | $ 1,500,000.00 | $ 14,691,773.79 | $ 93,843,773.79 |
| 90 Day Shutdown | 08/Apr/23 | 06/Jul/23 | 13/Jul/23 | 17/Aug/23 | 11/Sep/26 | 10/Mar/27 | -284 | $ 74,500,000.00 | $ 4,402,000.00 | $ 1,500,000.00 | $ 14,691,773.79 | $ 95,093,773.79 |
| 120 Day Shutdown | 08/Apr/23 | 05/Aug/23 | 12/Aug/23 | 16/Sep/23 | 11/Sep/26 | 10/Mar/27 | -284 | $ 75,750,000.00 | $ 4,402,000.00 | $ 1,500,000.00 | $ 14,691,773.79 | $ 96,343,773.79 |
| 150 Day Shutdown | 08/Apr/23 | 04/Sep/23 | 11/Sep/23 | 16/Oct/23 | 06/Oct/26 | 04/Apr/27 | -309 | $ 79,110,849.06 | $ 4,789,500.00 | $ 2,000,000.00 | $ 16,131,530.79 | $ 102,031,879.85 |

## STANDARD OF REVIEW

**The Preliminary Injunction Standard**:  A preliminary injunction is an "extraordinary remed[y] involving the exercise of a very far-reaching power to be granted only sparingly and in

limited circumstances." *Variable Annuity Life Ins. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021). It is to be granted only on a ***clear showing*** of entitlement to that relief. *Potomac Heritage Trail Ass'n v. U.S. DOT*, No. DLB-22-2482, 2022 WL 7051160, at \*6 (D. Md. Oct. 11, 2022). A movant must demonstrate "(1) a clear showing that the plaintiff will likely succeed on the merits at trial; (2) a clear showing that the plaintiff is likely to be irreparably harmed absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest." *Brown v. Bimbo Foods Bakeries Dist., LLC*, No. 2:16cv476, 2016 WL 9415418, at \*5 (E.D. Va. Sept. 13, 2016). The movant must satisfy all four requirements to obtain a preliminary injunction. *JAK Prods., Inc. v. Bayer*, 616 F. Appx. 94, 95 (4th Cir. 2015) (unpublished) (per curiam). NVCA, as the plaintiff, "bears the burden of establishing that each of these factors" supports granting the preliminary injunction. *HCI Techs. Inc. v. Avaya, Inc.*, 241 F. Appx. 115, 121 (4th Cir. 2007) (unpublished) (per curiam).

(i) *Success on the Merits*. The mere possibility of success on the merits is not enough. *Roe vs. D.O.D.*, 947 F.3d 207, 229 (4th Cir. 2020) (discussing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). The movant must prove that, "in light of the presumptions and burdens," it will ***likely*** prove its claim and survive the defendant's defenses. *PRE Holding, Inc. v. Monaghan Med. Corp.*, No. 3:09CV458—HEH, 2009 WL 3874171, at \*1 (E.D. Va. Nov. 17, 2009). If the defendant asserts a defense, the movant must show that it lacks substantial merit. *Id*. The existence of a factual dispute undercuts attempts to make a clear showing of likelihood of success. *Id*. at 5.

(ii) *Irreparable Harm*. "The required irreparable harm must be neither remote nor speculative, but actual and imminent." *Andreadakis v. C.D.C.*, No. 3:22cv52, 2022 WL 1204771, at \*6 (E.D. Va. Apr. 22, 2022). A movant's delay may indicate harm is not actual or imminent,

and, ultimately, not irreparable. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218 (4th Cir. 2019).

    *(iii)* <u>*Balance of Equities*</u>. When weighing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Coreth*, 535 F. Supp. 3d at 518. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. at 519.

    *(iv)* <u>*Public Interest*</u>. The movant also must show that granting the motion will benefit the public interest. *Signature Flight Support Corp. v. Landow Aviation Lts. P'ship*, No. 1:08cv955, 2009 WL 111603, at *12, 13 (E.D. Va. Jan. 14, 2009).

    <u>**Agency Action**</u>: NEPA is a procedural statute; rather than requiring agencies to reach particular substantive results, it only "imposes procedural requirements that obligate federal agencies to undertake analyses of the environmental impact of their proposals and actions." *Id*. (citation omitted). "Because NEPA is a procedural and not a results-driven statute, ***even agency action with adverse environmental effects can be NEPA-compliant*** so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (citation omitted) (emphasis added).

    Federal agencies often prepare an Environmental Assessment ("EA") in order to determine whether a more extensive evaluation of environmental effects is required.[7] An EA is less

---

[7] An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an Environmental Impact Statement [("EIS")] or a finding of no significant impact [("FONSI")]." *Ohio Valley*, 556 F.3d at 191.

demanding than an Environmental Impact Statement ("EIS").[8] If the EA determines that the agency's action will not have significant effects on the environment, the agency will issue a FONSI and proceed with its action. 40 C.F.R. § 1502.9(d)(4). "Significance is determined by evaluating both the context of the action and the intensity, or severity, of the impact." *Ohio Valley*, 556 F.3d at 191.

On judicial review under the APA, the relevant question is whether the "decision not to prepare a supplemental EIS was arbitrary or capricious." *See Currituck*, 60 F.4th at 801. This review is "highly deferential, with a presumption in favor of finding the agency action valid," *Defs. of Wildlife v. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019).

**Article III Standing**: An organizational plaintiff may establish "associational standing" "on behalf of its members when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (quoting *Friends for Ferrell Parkway, LLC v. Stasko,* 282 F.3d 315, 320 (4th Cir.2002)); *see also Outdoor Amusement Bus. Ass'n, Inc.*

---

[8] An EIS outlines in depth an agency's decision-making process. It is a "rigorous review of the environmental impacts that is required only for 'major Federal actions significantly affecting the quality of the human environment.'" *Friends of the Cap. Crescent Trail v. U.S. Army Corp. of Eng'rs.*, 855 F. Appx. 121, 125 (4th Cir. 2021) (unpublished) (quoting 42 U.S.C. § 4332(C)). In some circumstances, a supplemental EIS is required when there is a significant change in circumstances related to the agency action. If an EA determines that the agency's action may have significant effects on the environment, the agency will proceed to develop an EIS. 40 C.F.R. § 1502.9(d)(1)(ii). This is required if the effects are "significant" to an "extent not already considered." *No Mid-Currituck Bridge-Concerned Citizens and Visitors Opposed to the Mid-Currituck Bridge, et al. v. N.C. Dep't of Trans., et al.*, 60 F.4th 794, 801 (4th Cir. 2023). "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decision making process. Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004).

*v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020). To have standing as individuals: (1) the members must have suffered an injury in fact which is concrete and particularized and which is actual or imminent; (2) there must be a causal connection between the members' injury and the actions of the defendant, in other words fairly traceable to the defendant's conduct, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by the relief sought. *Zargarpur v. Townsend*, 18 F. Supp. 3d 734, 737 (E.D. Va. 2013); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff challenging agency action must further meet the prudential standing requirements under the APA, which requires that the plaintiff's grievance "fall within the 'zone of interests'" to be protected or regulated by the statute or the constitutional guarantee in question." *Pye v. United States,* 269 F.3d 459, 466-67 (4th Cir. 2001).

## **ARGUMENT**

### I.  **NVCA's Excessive Delay in Bringing Its Motion Precludes Relief.**

NVCA's delay is "quite relevant to balancing the parties' potential harms." *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75 (4th Cir. 1989). Because an application for injunctive relief "is based upon an urgent need for the protection of a Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Id.* (stating that a period of delay in seeking injunctive relief "may indicate an absence of the kind of irreparable harm required to support" injunctive relief) (brackets and citation omitted). NVCA's "delay undermines its claim of urgent need for [injunctive relief] to protect against imminent injury." *See Kirollos*, 2009 WL 10689357, at *5; *Mountain Valley*, 915 F.3d at 218 (indicating that a delay in seeking relief may indicate harm is not actual or imminent, and, ultimately, not irreparable).

NVCA and its members have known about this project for years. They have known about the specific design features they are challenging for, at least, many months. VDOT has made

14

extensive efforts to keep the public, including NVCA, informed. And construction has been ongoing, including in the Live Oak Drive area, for many months. If NVCA thought the project would cause irreparable harm, it had more than ample notice and opportunity to seek relief and chose not to do so. NVCA cannot now come to this Court claiming an emergency and irreparable harm.

## II.    NVCA Cannot Demonstrate a Likelihood of Success on the Merits of Its Claims.

NVCA cannot demonstrate "a clear showing that the plaintiff will likely succeed on the merits at trial." *See Brown*, 2016 WL 9415418, at *5. First, the Court lacks subject matter jurisdiction because NVCA has not alleged facts sufficient to establish Article III standing. As to the actual or imminent harms alleged, NVCA lacks standing because (i) the alleged harms are not fairly traceable to the challenged agency conduct, and (ii) NVCA's alleged harms are not redressable by the relief it seeks. In short, NVCA does not meet the elements of associational standing for the claim it asserts because its members do not individually have standing to sue. Consequently, the Court lacks subject matter jurisdiction and NVCA cannot show likelihood of success on the merits because it cannot properly bring this suit.

Second, NVCA cannot prevail on NEPA or APA claims where—as here—NVCA's asserted claims are time barred. NVCA's 150-day window to challenge VDOT's NEPA documentation expired long ago: on March 3, 2022.

Third, even if there were no time bar, NVCA has conceded it does not challenge the agencies' manner of studying the project under NEPA. (Compl., ¶ 72.) The so-called post-NEPA design refinements of concern to NVCA were fully anticipated and addressed by the NEPA analysis and documentation. The NEPA documentation encompasses virtually any reasonable design configuration within the LOD (an agency decision NVCA is barred from challenging). And

FHWA performed analyses showing that environmental impacts outside the LOD could not be significant regardless of the design. NVCA's claims amount to an impermissible end-around challenge to that NEPA documentation.

**A. NVCA Lacks Article III Standing Because It Fails to Demonstrate That Its Current, Alleged Harms Are Traceable to the Challenged Agency Conduct or Redressable by Granting the Relief Requested.**

NVCA is unlikely to establish that its members actually possess standing—dooming its effort at the outset. To establish standing, the actual or imminent harm must be fairly traceable to the challenged agency conduct, and such harm must be redressable by an order upholding the plaintiff's challenge. *Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017). The actual harms alleged in this case come nowhere near meeting that standard.

**Traceability and Redressability**: NVCA alleges several types of construction-related harms. The alleged harms include health impacts from construction-related dust (Compl., ¶¶ 10, 21, 22, 23.), night-time noise caused by construction (Compl., ¶¶ 21, 23, 24.), sound and light pollution from passing cars (Compl., ¶¶ 9, 19, 23, 24, 88.), loss of privacy related to the construction; it claims residents' homes are now visible to "everyone driving on the I-495 and George Washington Parkway exit" (Compl., ¶¶ 21, 23.), deforestation (Compl., ¶ 70.); and erosion (*See, e.g.,* Compl., ¶ 84.vii.). But these alleged harms resulting from construction work are not traceable to the challenged procedural conduct—they would happen even if VDOT and CBE were to revert to the unchallenged September 2021 plans (*see, e.g.,* Ex. 1, REA at 3-80 ("There would be approximately 118 acres of tree clearing associated with the construction of the project due to the widening of the roadway, ramps, and interchange re-configurations, noise barriers, stormwater management facilities, and all other appurtenant structures."))—and thus the requested procedural relief will not redress those alleged harms. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000); *Zargarpur*, 18 F. Supp. 3d at 737 (defining

redressability as "a likelihood that the requested relief will redress the alleged injury"); *Miller v. Dish Network, L.L.C.*, 326 F. Supp. 3d 51, 57 (E.D. Va. 2018) (quoting *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (stating that it must be "likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit").[9]

**Speculative Claims**: NVCA also makes numerous speculative claims of harm without any support, such as the impact of a decreased road width on the safety of children. (*See* Compl., ¶ 25.) NVCA simply assumes that it will occur without any basis on which to opine. The allegations of increased traffic flow and associated air pollution problems due to Maryland's failure to build its portion of the beltway expansion are likewise highly speculative because there is no reason to suppose Maryland will reverse its plan to proceed with its project. (*See* Compl., ¶ 20.) These claimed harms are textbook examples of a probabilistic impact; they are too uncertain to be deemed actual. The harms that *might* occur *if* Maryland reverses course are too speculative for standing purposes. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury." *Lujan*, 504 U.S. at 564. Indeed, just a few weeks ago, Maryland's executive leadership emphasized that Maryland remains committed to its project.[10] Fundamentally, it is pure

[9] The expansion of impermeable surfaces suffers the same fate as other alleged harms. (*See* Compl., ¶ 73.) While the planning-level design developed to inform NEPA does not provide a breakdown of impervious versus pervious surface, the agencies assumed that everything within the LOD would be completely impacted, as explained below, and would therefore require some level of water quality measures and erosion and sediment control. (Ex. 1, REA at 3-1.). Because such details were not known at the time of the Revised Environmental Assessment, FHWA made commitments in the FONSI to abide by VDEQ's erosion and sediment standards and the state's Virginia Stormwater Management Act. (Ex. 8, FHWA FONSI at 10.) In doing so, FHWA committed to fully considering and mitigating the stormwater impacts of temporary ground disturbance and permanent impervious surfaces. Pausing construction and requiring further study will do nothing to change that outcome.
[10] (Accelerate Maryland Partners Phase Public-Private Partnership Agreement Update, Mar. 22, 2023, available at https://oplanesmd.com/ampartners-agreement-update/.)

conjecture to believe that, absent construction of the Maryland project, traffic and air pollution would increase near Live Oak Drive. NVCA has not alleged concrete injury from any future Maryland decision sufficient to support standing to challenge the alleged harms. *Stasko*, 282 F.3d at 320.

### B.  NVCA's Claims and Alleged Harms Pertain to Agency Actions for Which Review Is Time Barred.

NVCA has too long delayed seeking the relief it seeks, not only giving the lie to any assertion in their preliminary injunction motion that the situation is "emergent," but also filing suit beyond the applicable limitations period. Most of the harms alleged by NVCA, especially its assertion that additional design alternatives must be studied, are attributable to agency actions for which judicial review is time barred by statute. When FHWA published its notice of the REA, FONSI, and other project documents on October 4, 2021, it did so pursuant to 23 U.S.C. § 139(I)(1), which provides:

> Notwithstanding any other provision of law, a claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project ***shall be barred unless it is filed within 150 days*** after publication of a notice in the Federal Register announcing that the permit, license, or approval is final pursuant to the law under which the agency action is taken, unless a shorter time is specified in the Federal law pursuant to which judicial review is allowed. Nothing in this subsection shall create a right to judicial review or place any limit on filing a claim that a person has violated the terms of a permit, license, or approval. (Emphasis added).

FHWA specified that its notice applied to all project documents and all laws under which its actions were taken, including NEPA. 86 Fed. Reg. 54785 (Oct. 4, 2021). FHWA made clear that any claim seeking judicial review of the REA, FONSI, and other project documents in its files would be barred unless filed on or before March 3, 2022. *Id*.

18

In addition, "[NVCA] does not challenge the project as originally proposed and studied under NEPA." (Compl., ¶ 72.) Therefore, all facets of the project addressed by VDOT's EA, REA, FONSI, and voluminous supporting documentation cannot be put at issue in this case. Consequently, *the manner in which FHWA and VDOT "studied" the project "under NEPA" cannot be challenged.* As discussed below, the agencies set boundaries and made assumptions at the conceptual design phase when the EA, REA, and FONSI were prepared—including the bounds of the LOD. If subsequent design refinements do not transgress those boundaries or render assumptions invalid, then further NEPA analysis is unnecessary. *See Valley Rod & Gun Club v. Chesapeake Appalachia, LLC*, No. 3:13-CV-0725, 2017 WL 1173930, at *7 (M.D. Pa. Mar. 29, 2017) (granting defendant's motion for summary judgment where defendant's construction activities fell within the defined limits of disturbance). That is the situation here.

The REA prepared by VDOT sets forth a map that captures the Limits of Disturbance ("LOD"). (Ex. 1, REA, at 3-3.) Among the most important boundaries established by the agencies, the LOD was established at the conceptual design phase. (*Id*. at 3-1.) The map in the REA that captures the LOD depicts the entire cloverleaf, including trees, the stormwater basin, and space around the cloverleaf and Live Oak Drive itself. The REA was approved by and incorporated in the FONSI; included in this approval was the LOD. The REA states that VDOT "assume[d] complete direct impact to the resource occurring in the LOD." (*Id*. at 3-3.) VDOT and FHWA did not parse the proposed activity within the LOD in fine detail. Instead, they assumed that all of the area within the LOD will be impacted. It is a worst-case assumption, and it forms the basis for determining whether there will be significant environmental impacts. If future design refinements shift an impact from one portion of the LOD to another, there is ***by definition no need for additional analysis of impacts*** because those impacts were already assumed and considered. Here,

19

the design refinements challenged by NVCA fall within the LOD. NVCA filed its Complaint on

March 16, 2023, exceeding the statutory time bar by more than one year. (ECF No. 1.)[11]

In short, NVCA has conceded that the agencies' approach to implementing NEPA was

acceptable ***and*** NVCA is time barred from seeking judicial review of the agencies' NEPA

documents embodying that approach. It cannot challenge:

- The FHWA decision that the Virginia and Maryland projects are not connected actions. (Ex. 8, FHWA FONSI at 18-19; Ex. 1, REA at 1-1—1-2.);

- The selection of only a "build" alternative and a "no build" alternative, with no sub-alternatives to be studied in detail, such as various ramp configurations, smaller stormwater ponds, alignment of Live Oak Drive, spacing between the street and the noise barriers, or the width of the street itself. (Ex. 1, REA at 2-1—2-7; Ex. 8, FHWA FONSI at 16-18.);

- The assumption that all areas within the LOD will be fully impacted by the project, including significant deforestation, increased impervious surfaces, and impacts to Live Oak Drive. (Ex. 1, REA at 3-1.);

- Conclusions drawn from air pollution modeling that demonstrate the worst-case interchanges will comply with ambient, health-based standards, and the I-495 interchange with GW Parkway will experience even better conditions. (Ex. 1, REA at 3-55.);

- The agencies' decision to rely on compliance with federal air pollution standards, stormwater pollution and erosion control permitting, and noise mitigation guidance—based on extensive, detailed federal and state standards, regulations, permits and other approvals reflecting known levels of health and environmental impacts—as indicators that impacts are not significant enough to warrant preparation of any further NEPA analysis or documentation. (Ex. 8, FHWA FONSI at 12; Ex. 1, REA at 4-1.)

---

[11] The REA also examined potential environmental impacts outside the LOD. VDOT determined that potential air quality impacts to the region would not run afoul of "applicable . . . air quality requirements." (Ex. 1, REA at 3-60.) Similarly, VDOT analyzed the anticipated noise level increase should the project proceed to completion, and determined that noise levels would increase by "approximately one" decibel. (*Id*. at 3-64.) For its part, FHWA "considers changes in noise levels of 3 [decibels] or less to be barely perceptible to the human ear." (*Id.*)

VDOT and FHWA followed a rational, well-established process for implementing NEPA in connection with this project. NVCA has conceded it does not assert any challenge to that process, and they are time barred from seeking review of the associated NEPA documents, *including the decisions, presumptions, assumptions and rationales embodied in those documents*. Accordingly, on Count I—which challenges design elements that are all justified by the scope and rationale of the agencies' NEPA analyses—NVCA cannot prevail.

### C.  NVCA's NEPA and APA Claims Fail.

**NEPA Claim**: Even if there was no time bar, NVCA has not shown that VDOT and FHWA should have prepared a supplemental EA to account for the design changes that NVCA purports to challenge. VDOT and FHWA "conclude[d] after a preliminary inquiry that the environmental effect of the change is clearly insignificant." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 222 (4th Cir. 2019). In other words, VDOT and FHWA "took a hard look at the proffered new information." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).

VDOT and FHWA considered the design refinements since the FONSI and determined that the changes are not "significant" or "major," and they are certainly not a "massive expansion." *See* 40 C.F.R. § 1502.9(d)(1)(ii) (stating that a SEIS is required where new circumstances or information that is relevant to environmental concerns is "significant"); *see Ohio Valley*, 556 F.3d at 191 ("Significance is determined by evaluating both the context of the action and the intensity, or severity, of the impact."). "Not every new circumstance requires a supplemental EIS." *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 63 (4th Cir. 1990) (citation omitted). Rather, "the new circumstance must present a ***seriously*** different picture of the environmental impact of the proposed project from what was previously envisioned." *Id.* (emphasis in original).

Here, the context considered by the agencies is a massive project to improve daily life for thousands, and the severity of the impact is a small shift in the already minor realignment to a local, dead-end street. The design refinements do not "affect the quality of the human environment in a significant manner or to a significant extent not already considered." *See Currituck*, 60 F.4th at 801. The impacts of the changes were already studied in VDOT's and FHWA's previous analysis, including the air quality, noise, water quality and quantity, and congestion. More fundamentally, each and every challenged tweak to the interchange work near Live Oak Drive is well within the LOD of the project—a fact that fatally undercuts NVCA's arguments that a new EIS, or even a supplemental EA is needed because VDOT and FHWA already determined that all areas within the LOD are impacted and those impacts are not significant, a decision as to which any challenge is time barred. (*See* Compl., ¶ 95.)

The illustrative image below (presented by VDOT to the McLean Citizens Association on February 12, 2023) makes all of this plain:



22

*The altered design features are all insignificant*:

- Ramp 1 is being lowered to better match the height of the existing ramp elevations. This is certainly not a "significant" change to what was approved in September 2021; in fact, NVCA has not identified *any* impact of this design change to Live Oak Drive.

- The shift of Live Oak Drive closer to the Beltway is also not a "significant" change, either—it is a move of 4 feet *closer* to the Beltway (and within the LOD).

- NVCA has also not shown that moving the new Live Oak Drive bridge to south (rather than north) of the existing bridge can be described as a "significant" design change, and certainly not a change with negative impacts. In fact, the new design will result in *reduced* construction and traffic impacts to Langley Swim Club.

- Finally, the expansion and relocation of the new stormwater management basin nested within Ramp 5 is also not a "significant" design change—and again, is wholly within the LOD and therefore immune to challenge here. NVCA has not demonstrated how the change is "significant." NVCA has also not demonstrated how the relocation of the basin is "significant." NVCA has failed to carry its burden here.

Further, the alleged traffic-related environmental impacts are not "significant" enough to warrant additional environmental review. NVCA has not shown that the redesign and relocation of ramps is causally connected to a meaningful, incremental increase in air emissions or other effects beyond the effects expected from previous designs. NVCA has made assertions and identified references to general scientific literature, but has not provided facts demonstrating any incremental health effects. Yet this is belied by the REA, which determined that the project met "all applicable . . . air quality requirements." (Ex. 1, REA at 3-60.)

Similarly, the notion that the consolidation of stormwater controls from multiple, smaller facilities to fewer, larger ones will produce an *incremental* effect on water quality and vector-borne-disease issues is rank speculation. NVCA has provided no facts to support this assertion or that would contradict the ample engineering studies and agency conclusions on this topic. To the contrary, the stormwater facility is designed and permitted as a "dry extended detention basin" according to Virginia DEQ design requirements. (Ex. 2, October 2022 SWM Report at 14; Ex. 9,

23

DEQ at 2.) As designed, it will comply with Virginia water quality standards. Further still, the vast majority of the basin will drain completely within 30 hours, eliminating any concern regarding mosquito breeding. (*See* Ex. 2, October 2022 SWM Report at 4; Ex. 10, DEQ BMP-14 at 22.)

NVCA also asserts that the safety of school children would be placed at risk due to design changes on Live Oak Drive. (Compl., ¶ 76.) Again, this is purely speculative, NVCA has provided no facts supporting the assertion that slightly narrowing the road and erecting a retaining wall would create "an obvious traffic hazard" not already present.

Additionally, NVCA's assertions about the so-called "bridge to nowhere" do not demonstrate legal error. (Compl., ¶¶ 2, 3.) First, it is wrong to suggest that ramps connecting into the Maryland project are being constructed as part of the I-495NEXT project. Second, NVCA asserts that VDOT should nonetheless reassess the possibility that Maryland will reverse course and will never complete related projects in that state and at the bridge. (Compl., ¶ 85.) But Maryland has made a statement committing to its project, fatally undercutting NVCA's speculation that Maryland will not carry out its intended highway construction.[12] Importantly, a decision to build in contemplation of similar road work across the Potomac River is a policy decision for VDOT, not a basis for challenging the NEPA process. *Potomac Heritage*, 2022 WL 7051160, at *20 (denying injunctive relief because the plaintiffs' claims were ultimately substantive policy

---

[12] Maryland Department of Transportation ("MDOT") Secretary Paul J. Wiedefeld confirmed that "MDOT is committed to delivering a new American Legion Bridge and transportation solutions that relieve traffic congestion throughout this corridor and promote equity and environmental protection." (Accelerate Maryland Partners Phase Public-Private Partnership Agreement Update, Mar. 22, 2023, available at https://oplanesmd.com/ampartners-agreement-update/.) He said the state "will move forward in a manner that ensures social equity, environmental protection, and engagement with local partners while always acting in the best interest of taxpayers." (*Id.*) Governor Wes Moore and Lieutenant Governor Aruna Miller echoed the commitment to continuing the Maryland project. (*Id.*)

disagreements). Moreover, as addressed in VDOT's brief, VDOT assessed this project independently from the Maryland project.

Because VDOT and FHWA "conclude[d] after a preliminary inquiry that the environmental effect of the change is clearly insignificant, its decision not to prepare a supplemental EIS satisfies the hard look requirement" and NVCA has failed to establish a likelihood of success on the merits. *See Save Our Sound*, 914 F.3d at 222 (brackets omitted).

**APA Claim**: NVCA has not shown (and cannot show) that VDOT and FHWA's actions, findings, or conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see Mountain Valley*, 990 F.3d at 826. Each followed guidelines and regulations to ensure that the I-495NEXT project comported with federal standards. VDOT and FHWA considered all important aspects of the project, and all conclusions drawn and decisions made by VDOT and FHWA were based on evidence from extensive evaluations and analyses they conducted. The action taken by VDOT and FHWA was not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See id*. Nor are the post-REA minor changes to the Live Oak Drive vicinity somehow beyond the pale here—FHWA already considered that VDOT would cause "direct and complete" impact to the LOD, and issued its FONSI with that knowledge. (Ex. 1, REA at 3-1—3-3.) VDOT's changes cannot possibly be more impactful than already assumed in the REA.

### D. Plaintiff Cannot Prevail on Count II Because NVCA Relies on the Wrong Agreement.

Although it does not appear that NVCA is relying on Count II in its motion, NVCA will also fail to succeed on the merits of claim alleging impermissible delegation to CBE. NVCA relies on wrong agreement between VDOT and a different entity related to a different project. The correct, operative Second Amended and Restated Comprehensive Agreement Relating to the

Route 495 HOT Lanes in Virginia Project. ("ARCA") with CBE is attached hereto as Ex. 11. The ARCA is unequivocal; CBE, working with VDOT, is required to obtain all Regulatory Approvals necessary to carry out the project, including NEPA supplemental approvals. (Ex. 11, September 30, 2021 ARCA at § 7.07(d) and Ex. A thereto.) Nowhere does the ARCA grant CBE the ability to grant those approvals to itself. Indeed, FHWA regulations make clear that CBE cannot do so (that responsibility rests with VDOT), and CBE may only provide technical studies and comment upon environmental reviews. 23 C.F.R. § 771.109(c)(5)-(6). Moreover, NVCA has not identified a single instance in which it contends CBE has deviated from these clearly defined guardrails. Because NVCA has presented no evidence of improper delegation, and the terms of the correct ARCA clearly show that VDOT and FHWA have not delegated any improper authority to CBE, this claim fails. Moreover, any issue with supposed improper delegation could have been raised long ago, again belying any need for preliminary injunctive relief.

## II.    Movants Have Not Demonstrated Irreparable Harm.

NVCA also cannot demonstrate that the alleged harms are irreparable. *See Dan River, Inc. v. Icahn*, 701 F.2d 278, 285 (4th Cir. 1983) (denying injunctive relieve where plaintiff "face[d] no immediate threat of irreparable harm"). An irreparable harm cannot be "remote" or "speculative," but rather must be "actual and imminent." *Andreadakis*, 2022 WL 1204771, at *6. The harms alleged by NVCA are reparable because there are either temporary or speculative.

NVCA alleges harms resulting from the immediate construction work, including air pollution from construction dust, light pollution, temporary paving, and construction noise. However, these alleged harms are temporary because the construction's life-expectancy is not permanent. *West Alabama Quality of Life Coalition v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 685 (S.D. Tex. 2004) (finding no irreparable harm where there were allegations of

"increased traffic, []increased noise and air pollution" caused by construction, but where the construction's life-expectancy was "not permanent or of long duration")*; see Mountain Valley*, 915 F.3d at 218 ("By definition, a temporary loss is not irreparable."). To the extent they exist, these harms will cease to exist upon completion of the I-495NEXT project. Therefore, such harms alleged by NVCA are by their nature not irreparable.

Furthermore, the alleged harms are "speculative;" each is based on perceptions, opinions, and conjecture, rather than on facts. *See Andreadakis*, 2022 WL 1204771, at *6. NVCA has failed to clearly show concrete harm that would result from the Defendants' actions. It presents no evidence of increased air or noise pollution, or of increased traffic, or mosquitoes. Because these alleged harms are speculative, they are not irreparable.

## III.    <u>The Balance of Equities Weighs Against an Injunction.</u>

A preliminary injunction must not issue if NVCA cannot clearly show that the alleged harm it stands to suffer in the absence of a preliminary injunction outweighs the harms that will be inflicted on VDOT, CBE and the drivers and passengers they serve should the restraining order issue. Here, there can be no doubt that a preliminary injunction will inflict vastly greater harms than it will avoid.

CBE stands to suffer substantial harms if a preliminary injunction issues. If the project is halted at Live Oak Drive, then the immediate effect is to prevent CBE and VDOT from working in tandem with local utilities to move critical utility lines out of harm's way, thereby enabling construction on a key retaining wall necessary for construction of the access ramps, new sound wall, and the ultimate realignment of Live Oak Drive. This is a critical path issue with cascading effects on the whole project, as detailed in the Declarations of Victoria Jones and Amanda Baxter. A 30-day halt now is estimated to delay construction by 178 days and with a cost of at least $71

million. A 150-day halt now is estimated to delay construction 309 days with a cost of more than $102 million. The harms claimed by NVCA—affecting just a few homeowners—pale in comparison.

## IV.    **The Public Interest Does Not Favor Issuance of Injunctive Relief.**

The I-495NEXT project will provide significant benefits by addressing traffic congestion, travel choice, and travel reliability for hundreds of thousands of residents of the Washington, D.C. Metropolitan Area (and beyond), every day. Currently, after analysis of traffic patterns in the area of the I-495NEXT construction scope, VDOT identified a litany of ills and inefficiencies, such as "[s]ubstantial multi-hour" traffic jams, including hours-long "bottlenecks" caused by existing lane structures and "heavy demand and congestion" (Ex. 1, REA at 1-15.) VDOT also identified continuing traffic "disturbances" caused by "local parallel arterial" roadways being used as a cut-around by drivers hoping to avoid traffic slowdowns (*Id.*.) Further still, inaction would simply make the problems worse, because based on demographic analyses, VDOT anticipates "substantial" growth in highway users as the region's population increases (*Id.* at 1-11.) And "no build" is no solution—VDOT already determined that without significant infrastructure improvements in the I-495NEXT project area, the problems it identified would simply get worse. (*Id.* at 2-1—2-8.) The record is crystal clear that the interests of the general public are served by a swift and uninterrupted construction schedule as currently contemplated by VDOT and CBE.

By contrast, NVCA's concerns are highly local and individual in nature, and the relief NVCA seeks—the indefinite delay of a critical infrastructure improvement—would negatively impact exponentially more people than it would help.

V.     **Bond.**

Federal Rule of Civil Procedure 65(c) is unequivocal: an injunction may issue "only of the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." An injunction order is a legal nullity unless and until such a bond is posted. *See City Auto, Inc. v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 806 F. Supp. 567, 668-69 (E.D. Va. 1992). As detailed above, if construction is halted, losses due to delay on the project could exceed $100 million. Accordingly, if the Court were inclined to grant relief, NVCA should be required to post a bond sufficient to protect CBE and VDOT from these losses.

## CONCLUSION

For the reasons set forth above, NVCA's request for injunctive relief should be denied.


Dated: April 6, 2023                              Respectfully submitted,

/s/ *N. Thomas Connally, III*
N. Thomas Connally, III (VSB No. 36318)
Jon M. Talotta (VSB No. 44590)
W. James Conlin, IV (VSB No. 92169)
Kellie A. Majcher (VSB No. 96162)
James T. Banks (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, Virginia 22102
(703) 610-6100 (Telephone)
(703) 610-6200 (Facsimile)
tom.connally@hoganlovells.com
jon.talotta@hoganlovells.com
william.conlin@hoganlovells.com
kellie.majcher@hoganlovells.com
james.banks@hoganlovells.com

*Counsel for Defendant Capital
Beltway Express LLC*

29